# K MART CORP. *v.* CARTIER, INC., ET AL.

No. 86–495.   Argued October 6, 1987—Decided March 7, 1988*

---

*Together with No. 86–624, *47th Street Photo, Inc.* v. *Coalition to Preserve the Integrity of American Trademarks et al.*, and No. 86–625, *United States et al.* v. *Coalition to Preserve the Integrity of American Trademarks et al.*, also on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-
SHALL, BLACKMUN, and STEVENS, JJ., joined.   SCALIA, J., filed a dissent-

ing opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 191. KENNEDY, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Cohen* argued the cause for petitioners in No. 86–625. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Assistant Attorney General Spears, Jeffrey P. Minear, David M. Cohen,* and *Robert V. Zener. Robert W. Steele* argued the cause for petitioners in Nos. 86–495 and 86–624. With him on the briefs for petitioner in No. 86–495 were *Robert E. Hebda* and *James C. Tuttle. Nathan Lewin* and *Jamie S. Gorelick* filed briefs for petitioner in No. 86–624.

*William H. Allen* argued the cause for respondents. With him on the brief were *Eugene A. Ludwig* and *Scott D. Gilbert.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Washington by *Kenneth O. Eikenberry,* Attorney General, and *John G. Hennen,* Senior Assistant Attorney General; for the American Free Trade Association by *Stephen Kurzman, Robert Ullman,* and *Steven R. Trost;* for the Consumers Union of U. S., Inc., by *Alan Mark Silbergeld;* for Darby Dental Supply Co. et al. by *Robert V. Marrow;* for the National Association of Catalog Showroom Merchandisers by *Richard B. Kelly* and *Thomas P. Mohen;* for the National Mass Retailing Institute by *William D. Coston* and *Robert J. Verdisco;* and for Progress Trading Co. by *William F. Sondericker, Robert L. Hoegle,* and *Frank W. Gaines, Jr.*

Briefs of *amici curiae* urging affirmance were filed for American Cyanamid Co. et al. by *David Ladd* and *Thomas W. Kirby;* for the American Intellectual Property Law Association, Inc., by *Neil A. Smith;* for Duracell Inc. by *James N. Bierman, Jay N. Varon,* and *Sheila McDonald Gill;* for Lever Brothers Co. by *Robert P. Devlin;* for the Motor Vehicle Manufacturers Association of the United States, Inc., by *William H. Crabtree;* for the United States Trademark Association by *Marie V. Driscoll;* and for Yamaha International Corp. et al. by *Robert E. Wagner* and *Robert E. Browne.*

*Harold C. Wegner, Barry E. Bretschneider, Donald R. Dinan, Charles F. Schill,* and *Albert P. Halluin* filed a brief for Cetus Corp. as *amicus curiae.*

JUSTICE BRENNAN delivered the opinion of the Court.

A "gray-market" good is a foreign-manufactured good bearing a valid United States trademark, which is imported without the consent of the United States trademark owner. This action presents the issues whether a federal district court has jurisdiction to hear a challenge to the Secretary of the Treasury's regulation permitting the importation of certain gray-market goods, 19 CFR § 133.21 (1987), and, if so, whether the regulation is a reasonable agency interpretation of § 526(a) of the Tariff Act of 1930 (1930 Tariff Act), 46 Stat. 741, as amended, 19 U. S. C. § 1526.

I

Section 526(a) of the 1930 Tariff Act prohibits importing

"into the United States any merchandise of foreign manufacture if such merchandise . . . bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States . . . , unless written consent of the owner of such trademark is produced at the time of making entry." 19 U. S. C. § 1526(a).[1]

_____

[1] The full text of § 526(a), as codified, 19 U. S. C. § 1526(a), is as follows:

"(a) Importation prohibited

"Except as provided in subsection (d) of this section [an exception added in 1978 for the importation of articles for personal use], it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, unless written consent of the owner of such trademark is produced at the time of making entry."

180

The Customs Service regulation that implements § 526(a) does not prohibit importation of gray-market goods where the foreign manufacturer is *affiliated* with the United States trademark owner or has received the owner's *authorization* to use its trademark. The regulation provides generally that "[f]oreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations." 19 CFR § 133.21(b) (1987).[2] But the

---

[2] The Customs Service regulation provides in relevant part:

"§ 133.21 Restrictions on importations of articles bearing recorded trademarks and trade names.

.          .          .          .          .

"(b) *Identical trademark.* Foreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations.

"(c) *Restrictions not applicable.* The restrictions set forth in paragraphs (a) and (b) of this section do not apply to imported articles when:

"(1) Both the foreign and the U. S. trademark or trade name are owned by the same person or business entity;

"(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control (see §§ 133.2(d) [defining "common ownership and common control"] and 133.12(d) [providing that application to record trademark must report identity of any affiliate that uses same trade name abroad]);

"(3) The articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U. S. owner;

"(4) The objectionable mark is removed or obliterated prior to importation in such a manner as to be illegible and incapable of being reconstituted, for example by:

"(i) Grinding off imprinted trademarks wherever they appear;

"(ii) Removing and disposing of plates bearing trademark or trade name;

"(5) The merchandise is imported by the recordant of the trademark or trade name or his designate;

"(6) The recordant gives written consent to an importation of articles otherwise subject to the restrictions set forth in paragraphs (a) and (b) of this section, and such consent is furnished to appropriate Customs officials; or

regulation furnishes a "common-control" exception from the ban, permitting the entry of gray-market goods manufactured abroad by the trademark owner or its affiliate:

"(c) *Restrictions not applicable.* The restrictions . . . do not apply to imported articles when:
"(1) Both the foreign and the U. S. trademark or trade name are owned by the same person or business entity; [or]
"(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control . . . ."

The Customs Service regulation further provides an "authorized-use" exception, which permits importation of gray-market goods where

"(3) [t]he articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U. S. owner . . . ." 19 CFR § 133.21(c) (1987).

Respondent Coalition to Preserve the Integrity of American Trademarks, an association of United States trademark owners, and two of its members (all three collectively referred to as COPIAT) brought suit in the United States District Court for the District of Columbia, seeking both a declaration that the Customs Service regulation is invalid and an injunction against its enforcement.[3] Specifically, COPIAT asserted that the common-control and authorized-use exceptions are inconsistent with both § 526(a) of the 1930 Tariff Act, and § 42 of the Lanham Trade-Mark Act, 15 U. S. C. § 1124, which prohibits the importation of goods bearing marks that "copy or simulate" United States trademarks. Petitioners

---

"(7) The articles of foreign manufacture bear a recorded trademark and the personal exemption is claimed and allowed under § 148.55 of this chapter." 19 CFR § 133.21 (1987).

[3] COPIAT sued the United States, the Secretary of the Treasury, and the Commissioner of Customs.

K mart Corporation and 47th Street Photo, Inc., intervened as defendants.

After rejecting 47th Street Photo's motion to dismiss on the ground that the Court of International Trade had exclusive jurisdiction over the case, the District Court upheld the Customs Service regulation against both challenges. 598 F. Supp. 844 (1984). The Court of Appeals affirmed the District Court's jurisdictional ruling but reversed on the merits. 252 U. S. App. D. C. 342, 790 F. 2d 903 (1986) (hereinafter *COPIAT*). We granted certiorari, 479 U. S. 1005 (1986), to resolve conflicts among the Courts of Appeals on both the jurisdictional issue, compare *Vivitar Corp.* v. *United States*, 761 F. 2d 1552, 1557–1560 (CA Fed. 1985), aff'g 593 F. Supp. 420 (Ct. Int'l Trade 1984), cert. denied, 474 U. S. 1055 (1986), with *Olympus Corp.* v. *United States*, 792 F. 2d 315, 317–319 (CA2 1986), aff'g 627 F. Supp. 911 (EDNY 1985), cert. pending, No. 86–757; and *COPIAT*, *supra*, at 344–346, 790 F. 2d, at 905–907, and the merits, compare *Vivitar Corp.*, *supra*, at 1560–1571, and *Olympus Corp.*, *supra*, at 319–322, with *COPIAT*, *supra*, at 346–355, 790 F. 2d, at 907–916. We now affirm the Court of Appeals' conclusion that the District Court had jurisdiction, and restore these cases to the calendar for reargument on the merits.

## II

Only petitioner 47th Street Photo contends that we lack jurisdiction over this litigation. Both the general federal-question provision, 28 U. S. C. § 1331, and the specific provision regarding actions "arising under any Act of Congress relating to . . . trade-marks," § 1338(a), would, standing alone, vest the district courts with jurisdiction over this action.[4] The District Court would be divested of jurisdiction, however, if this action fell within one of several specific grants of

---

[4] For the Lanham Trade-Mark Act claim, COPIAT also invoked a specific provision of that Act conferring to the district courts jurisdiction over all claims arising under the Act. 15 U. S. C. § 1121.

exclusive jurisdiction to the Court of International Trade. Petitioner propounds two theories in support of its claim that exclusive jurisdiction lies in the Court of International Trade. We reject both.

### A

Petitioner's first theory is that § 526(a) imposes an "embarg[o]" within the meaning of 28 U. S. C. § 1581(i)(3), which grants the Court of International Trade exclusive jurisdiction over suits against the Government arising out of federal laws that provide for "embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety . . . ."[5] The Court of Appeals rejected that theory on the ground that "Section 1581(i)(3) only extends to quotas and embargoes arising out of trade policy, the sort of measures that have traditionally limited the importation of shoes, textiles, automobiles, and the like." *COPIAT, supra,* at 346, 790 F. 2d, at 907. We agree with the Court of Appeals that § 526(a) is not an "embargo," but reach that conclusion on different reasoning.

---

[5] As relevant here, 28 U. S. C. § 1581 provides:

"(i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

"(1) revenue from imports or tonnage;

"(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

"(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

"(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

"(j) The Court of International Trade shall not have jurisdiction of any civil action arising under section 305 of the Tariff Act of 1930."

(1)

An embargo is a "[g]overnment order prohibiting commercial trade with individuals or businesses of other nations." Black's Law Dictionary 468 (5th ed. 1979). It is "[a] policy which prevents goods from entering a nation" and which "may be imposed on a product or on an individual country." J. Berenyi, The Modern American Business Dictionary 103 (1982). To be sure, embargoes, like those that the Court of Appeals enumerated, often implement trade policy. But (even assuming that the exclusion of foreign-manufactured goods bearing United States trademarks cannot fairly be said to implement trade policy) trade policy is not the sole, nor perhaps even the primary, purpose served by embargoes. The Government typically imposes embargoes to protect public health, see, *e. g.*, 21 U. S. C. § 381 (adulterated, misbranded, or unapproved foods, drugs, and cosmetics); safety, see, *e. g.*, 15 U. S. C. § 1397 (motor vehicles that do not conform to federal safety standards); or morality, see, *e. g.*, 19 U. S. C. § 1305 (obscene pictures, lottery tickets, and articles for causing unlawful abortion), or to further interests relating to foreign affairs, see, *e. g.*, 22 U. S. C. § 2370(a) (embargo on Cuba); law enforcement, see, *e. g.*, 15 U. S. C. §§ 1241–1244 (switchblade knives); or ecology, see, *e. g.*, 19 CFR § 12.60 (1987) (fur-seal or sea-otter skins).

We have discovered no evidence that Congress intended to constrain the ordinary meaning of the word "embargoes" to mean "embargoes that are grounded in trade policy." To the contrary, had Congress so intended, it would have been quite unnecessary to exclude expressly from the Court of International Trade's jurisdiction, as Congress did, embargoes that are for the "protection of the public health or safety," 28 U. S. C. § 1581(i)(3), or that prohibit the importation of certain "immoral articles," see § 1581(j) (excluding suits arising out of 19 U. S. C. § 1305, which prohibits importation of a panoply of "immoral articles").

(2)

Although we reject the Court of Appeals' analysis, we nevertheless agree with its conclusion that § 526(a) does not impose an embargo. As the above-quoted definitions suggest, the ordinary meaning of "embargo," and the meaning that Congress apparently adopted in the statutory language "embargoes or other quantitative restrictions," is a governmentally imposed quantitative restriction—of zero—on the importation of merchandise.

An importation prohibition is not an embargo if rather than reflecting a *governmental* restriction on the quantity of a particular product that will enter, it merely provides a mechanism by which a private party might, at its own option, enlist the Government's aid in restricting the quantity of imports in order to enforce a private right. Suppose, for example, that a domestic producer grants a foreign distributor exclusive distribution rights abroad, and that a provision of the contract, captioned "Importation prohibited," bars the foreign distributor from competing for domestic sales. If the foreign distributor nevertheless brazenly imports into the United States, the domestic manufacturer may invoke any of a number of contract remedies—including monetary or injunctive relief in court—to enforce its private right. A court-issued injunction is, technically, a "[g]overnment order prohibiting commercial trade." Yet one could no more deem the private party's enforcement of its "Importation prohibition" an "embargo" than deem damages for its breach a "tarif[f], dut[y], fe[e] or other ta[x] on the importation of merchandise," 28 U. S. C. § 1581(i)(2). The private party, not the Government, by deciding whether and how to exercise its private right, determines the quantity of any particular product that can be imported.

Section 526(a)'s "Importation prohibition" is of the same type. Trademark law, like contract law, confers private rights, which are themselves rights of exclusion. It grants the

trademark owner a bundle of such rights, one of which is the right to enlist the Customs Service's aid to bar foreign-made goods bearing that trademark. See 71 Cong. Rec. 3871 (1929) (remarks of Sen. George) (§ 526(a) "undoubtedly had its origin not in an effort to exclude merchandise bearing a trade-mark, but for the purpose of protecting the interest of the owner of the trade-mark who had gone to the trouble of registering it"); 62 Cong. Rec. 11603 (1922) (remarks of Sen. Sutherland) (§ 526(a) is designed to "protec[t] the property rights of American citizens who have purchased trade-marks from foreigners"). Thus, § 526(a)—like the court-issued injunction enforcing a contractual "Importation prohibition"—is very different from an embargo. It does not set a governmentally determined quantitative limit on the entry of, or foreign trafficking in, any particular product: The owner of the trademark can import to its heart's content, and will usually do so until the market is content; and any other importer may also import a particular foreign-manufactured trademarked good *ad infinitum*, if it acquires the trademark owner's consent to import. Nor does the Government have *any* control over the extent or the nature of § 526(a)'s prohibition. The trademark owner has sole authority to decide that all products bearing its trademark will enter or that none will, and to decide what entity may import them, under what conditions, and for what purpose. There is no reason to suppose that Congress would have intended to distort the term "embargo" beyond its ordinary meaning to encompass a provision that merely grants particular trademark owners a private property right—whose enforcement is entirely in the owners', not the Government's, control—to exclude intrabrand competition from abroad.[6]

---

[6] Section 526(a) is an unusual (if not a unique) breed of importation prohibition in that it takes *all* control out of the Government's hands and puts it in the hands of private parties. The only other importation prohibitions mentioned by the parties or JUSTICE SCALIA that might even conceivably match that description are the prohibitions against the importation of

JUSTICE SCALIA's conclusion that § 526(a) falls within the "ordinary meaning" of "embargo," *post*, at 196, follows from a rather extraordinary definition of the term as *any* governmental "import regulation that takes the *form* of a governmental prohibition on imports, regardless of . . . its ultimate purpose," *post*, at 195 (emphasis added). As the court-enforced contractual prohibition illustrates, not every governmental importation prohibition is an embargo. To hold otherwise would yield applications of the term "embargo" that are unnatural, to say the least. For example, the prohibitory nature of regulations providing that the *"importation* into the United States of milk and cream is *prohibited"* except by a permitholder, 19 CFR § 12.7(a) (1987) (emphasis added), and that "Customs officers *shall not permit the importation* of any milk or cream that is not tagged in accordance with [applicable] regulations," § 12.7(b) (emphasis added), would convert licensing and tagging requirements into embargoes on unlicensed or improperly tagged dairy products. Similarly, a requirement that certain meat products be inspected prior to importation would magically become an embargo of uninspected (but not necessarily tainted) meat when Congress uses a formulation like "meat . . . products *shall not be released from Customs* custody prior to inspection," § 12.8 (emphasis added). This sampling of import regulations demonstrates that JUSTICE SCALIA's departure from ordinary meaning, much more than our adherence to it, would "leave [§ 526(a)] to drift on the currents of lawyerly invention," *post*, at 196.

(3)

Contrary to petitioner's contentions, our adherence to the ordinary meaning of "embargo" is not at all inconsistent with the purposes of the Customs Courts Act of 1980, Pub. L. 96–417, 94 Stat. 1727, which enacted the jurisdictional provi-

---

goods that infringe trademarks, see 15 U. S. C. § 1124, or copyrights, see 17 U. S. C. §§ 601–603.

sion.   Congress intended, first and foremost, to remedy the confusion over the division of jurisdiction between the Customs Court (now the Court of International Trade) and the district courts and to "ensure . . . uniformity in the judicial decisionmaking process."   See H. R. Rep. No. 96–1235, p. 20 (1980).   But Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations.   Had Congress wished to do so it could have expressed such an intent much more clearly and simply by, for example, conveying to the specialized court "exclusive jurisdiction . . . over all civil actions against the [Government] directly affecting imports," S. 2857, 95th Cong., 2d Sess. (1978), or over "all civil actions against the [Government] which arise directly from import transactions and which arise under the Tariff Act of 1930 [or any one of several specified trade statutes]," S. 1654, 96th Cong., 1st Sess. (1979); see also H. R. 6394, 96th Cong., 2d Sess. (1980).

In rejecting bills that would have implemented such a categorical approach, Congress opted for a scheme that achieved the desired goals of uniformity and clarity by delineating precisely the particular customs-related matters over which the Court of International Trade would have exclusive jurisdiction.   Thus, for example, Congress granted the Court of International Trade exclusive jurisdiction over suits relating to "tariffs, duties, fees, or other taxes on the importation of merchandise," but not if they are for the "raising of revenue." 28 U. S. C. § 1581(i)(2).   Similarly, Congress made no provision for direct review in the Court of International Trade of facial challenges to conditions of entry, such as labeling or marking requirements, see, *e. g.*, 19 CFR §§ 11.6–11.7 (1987) (packaging and marking of distilled spirits, wines, and malt liquors); §§ 11.12–11.12b (labeling of wool, fur, and textile products), and inspection, see, *e. g.*, § 11.1 (inspection of cigars, cigarettes, medicinal preparations, and perfumery); § 12.8 (inspection of meats).   Or, to focus more closely on the

genre of trade regulation at issue here, no one disputes that Congress declined to grant the Court of International Trade exclusive jurisdiction over import prohibitions relating to "public health and safety" or "immoral articles." See *supra*, at 184. By choosing the word "embargoes" over the phrase "importation prohibitions," Congress likewise declined to grant the Court of International Trade exclusive jurisdiction over importation prohibitions that are not embargoes. To depart from the words Congress chose would infect the courts with the same jurisdictional confusion that Congress intended to cure.

Concededly, Congress did not fully explain its exclusion of certain customs-related matters from the Court of International Trade's jurisdiction. There is, for example, no obvious reason why Congress declined to grant that court jurisdiction to review challenges to conditions of importation of the type mentioned above. There may likewise be no adequate explanation for Congress' omission of importation prohibitions that do not fall within the ordinary meaning of "embargoes." Whatever the reason, however, we disagree with petitioner that the omission is inconsistent with Congress' intent to "utiliz[e] the specialized expertise of the United States Customs Court and the United States Court of Customs and Patent Appeals . . . ." H. R. Rep. No. 96–1235, *supra*, at 20. The Customs Court, which the Customs Court Act of 1980 renamed the Court of International Trade, and the Court of Customs and Patent Appeals, which the Federal Courts Improvement Act of 1982 merged with the Court of Claims to form the United States Court of Appeals for the Federal Circuit, had rarely dealt with, much less developed a "specialized expertise" in, trademark law. Nor is there any indication (aside from petitioner's strained reading of the term "embargo") that Congress wished the new institutions to acquire expertise in the area in which its predecessors had none.

In sum, the purpose and legislative history of the jurisdictional provision provide no hint that Congress intended to depart from the ordinary meaning of "embargoes."

B

Petitioner's second theory for vesting exclusive jurisdiction in the Court of International Trade is more easily rejected. It begins with 28 U. S. C. § 1581(a), which grants "[t]he Court of International Trade . . . exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." The "protest" referred to in subsection (a) is an administrative remedy available to challenge specified decisions by Customs officers, including a decision ordering "the *exclusion* of merchandise from entry . . . under any provision of the customs laws." 19 U. S. C. § 1514(a)(4) (emphasis added). Petitioner acknowledges that the present action is not a protest because it challenges a Customs Service decision to permit the entry of, not to exclude, gray-market goods. It asserts instead that since this suit involves subject matter that would have given rise to a protest had gray-market goods been excluded rather than admitted, the Court of International Trade had exclusive jurisdiction " 'as a corollary to protest jurisdiction under 28 U. S. C. § 1581(a).' " Brief for Petitioner 47th Street Photo, Inc. 17 (quoting *Vivitar*, 761 F. 2d, at 1560). The source of that putative corollary is 28 U. S. C. § 1581(i)(4), which confers on the Court of International Trade jurisdiction over suits against the Government arising out of federal laws pertaining to "administration and enforcement with respect to the matters referred to in [, *inter alia,]* subsectio[n] (a)."

We agree with the Court of Appeals that § 1581(i)(4) will not bear petitioner's reading. See also *Olympus Corp.*, 792 F. 2d, at 317–319. The "matte[r] referred to" in § 1581(a) is "the denial of [a] protes[t]," or at the very broadest, "a protest." Since this suit involves no "protest," much less a de-

nial of one, it cannot by any stretch of the imagination involve a "law . . . providing for . . . administration and enforcement" of a protest. *Id.*, at 318.

## III

We affirm the Court of Appeals' conclusion that the District Court had jurisdiction, and restore these cases to the calendar for reargument on the merits.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

In a Court that selects its docketed cases on the basis of the general importance of the issues they present, jurisdictional questions tend to get short shrift. The central issue in this suit, the so-called "gray-market" issue, which may have immediate and substantial effects on the national economy, has provoked no less than 15 *amici* briefs; while the jurisdictional question, which could have the undesirable consequence of preventing our immediate resolution of the merits, has been briefed in only 11 pages by petitioners and 6 pages by respondents. Understandably enough, no one, myself included, is eager to conclude that we are powerless to resolve the issue that is this suit's claim to national attention.

Even so, we must carefully review any question that asks us to determine the limits of a federal court's power, particularly when, as in this suit, two different sets of courts have concluded that they have exclusive jurisdiction over the subject of the suit. Compare *Vivitar Corp.* v. *United States*, 761 F. 2d 1552, 1557–1560 (CA Fed. 1985), cert. denied, 474 U. S. 1055 (1986); with cases below, 252 U. S. App. D. C. 342, 344–346, 790 F. 2d 903, 905–907 (1986); and *Olympus Corp.* v. *United States*, 792 F. 2d 315, 317–319 (CA2 1986). Moreover, while the gray-market question is of greater im-

mediate economic importance (though we would soon enough have another occasion to address it), the jurisdictional question, if decided incorrectly, may generate uncertainty and hence litigation into the indefinite future. In my view, the Court's resolution of this question strains the plain language of the statute, and blurs a clear jurisdictional line that Congress has established.

The Court of International Trade's exclusive jurisdiction extends to any civil action against the United States, its agencies or officers, "that arises out of any law of the United States providing for . . . embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U. S. C. § 1581(i)(3). The statute does not define "embargo," and there is no reason to give it anything other than its ordinary meaning. An embargo is "a prohibition imposed by law upon commerce either in general or in one or more of its branches," Webster's Third New International Dictionary 738 (1981), a "[g]overnment order prohibiting commercial trade with individuals or businesses of other nations," Black's Law Dictionary 468 (5th ed. 1979), an "[a]uthoritative stoppage of foreign commerce or of any special trade," Funk & Wagnalls New International Dictionary of the English Language 411 (1984).

The present lawsuit challenges a Customs Service regulation, 19 CFR § 133.21(c) (1987), that implements § 526(a) of the Tariff Act of 1930, 19 U. S. C. § 1526(a). That statutory provision, which begins with the caption "(a) Importation prohibited," excludes from the United States foreign-made merchandise bearing a trademark owned and recorded by a United States citizen or corporation. Section 526(a) is, to borrow language from the Senate debate, "an *embargo* against any foreign country shipping goods here where an American claims he has a trade-mark upon them." 62 Cong. Rec. 11603 (1922) (remarks of Sen. Kellogg) (emphasis added). Because this suit against the United States arises out of a law provid-

ing for an embargo, I would hold that it is within the exclusive jurisdiction of the Court of International Trade.

The Court acknowledges that the term "embargo" means a "governmentally imposed" import prohibition, *ante*, at 185, but it seems to me that its analysis departs from that truth. Surely § 526(a) prohibits imports, and that prohibition, enacted by Congress and enforced by an executive agency, is surely governmentally imposed. One might argue that the privately invocable exception to § 526(a) causes it not to be an *absolute* governmental prohibition, and that only *absolute* governmental prohibitions qualify as embargoes. The Court rightly avoids that line of analysis, however, since many of the provisions commonly regarded as embargoes contain privately invocable exceptions, such as exemptions for certain privately determined uses. See, *e. g.*, 19 U. S. C. A. § 1202, p. 265, Schedule 1, Part 4, Subpart E; 19 CFR §§ 12.80(b)(v), (vi) (1987). But if, despite its privately invocable exception, § 526(a) meets the requirement of being a prohibition, it unquestionably meets the requirement of being a governmentally imposed one. Here, as with other embargoes, the availability of a privately invocable exception affects the *extent* of the prohibition; but the residual prohibition, whatever its extent, is governmental.

The Court seeks to set § 526(a) apart from other embargoes with privately invocable exceptions by observing that "rather than reflecting a *governmental* restriction on the quantity of a particular product that will enter, it merely provides a mechanism by which a private party might, at its own option, enlist the Government's aid in restricting the quantity of imports in order to enforce a private right." *Ante*, at 185. Perhaps it is meant to provide such a mechanism, but that relates not to whether it *is* a governmental prohibition, but to what the *purpose* of the governmental prohibition happens to be. It is no more in accord with common usage to say that a provision cannot be an embargo if its purpose is to protect private rights than to say (as did the Court of Appeals in the

analysis that the Court readily rejects, *ibid.*, that it cannot be an embargo if its purpose is something other than trade policy. Embargoes are imposed for many different purposes, including sometimes the protection of private rights. Assuredly those which have the latter purpose are *different* from those that do not, but it is beyond me why that purpose, any more than any other one, would cause them not to be governmentally imposed import prohibitions. In my view, for example, the prohibition on the importation of art stolen from a private nonprofit museum, see 19 CFR §§ 12.104–12.104h (1987), is unquestionably an embargo. Moreover, since the lever that the Court is using for its analysis is the prohibition's asserted lack of "governmental" character, it should make no difference whether the objective of the prohibition is to protect a private "right," or to protect some other private interest, or the interest of some *non*private entity other than the Government itself. Thus, on the Court's analysis there would be excluded from the term "embargo" the prohibition on importing pre-Columbian sculptures or murals, which does not apply if the importer produces a certificate issued by the country of origin stating that the goods were not unlawfully exported. 19 U. S. C. § 2092; 19 CFR § 12.107 (1987). This is simply not in accord with normal understanding.

The Court seeks to establish the inherently "nonembargo" character of a prohibition protecting private property rights by noting that a court injunction enforcing a contractual import prohibition is not an embargo. *Ante,* at 185. I agree that an injunction is not an embargo, but that conclusion does not follow from the fact that the injunction issued at the instance of a private individual to protect property rights. A court injunction issued at the instance of a Government agency, to prevent importation that was part of a conspiracy in violation of the Sherman Act, would likewise not generally be thought of as an embargo—because the word is normally applied only to prohibitions imposed by the Legislative or Executive Branches of Government.

The short of the matter is that an "embargo" is an import regulation that takes the form of a governmental prohibition on imports, regardless of any exceptions it may contain and regardless of its ultimate purpose—just as quotas, tariffs, and conditions on importation are identifiable forms of import regulation regardless of their exceptions and purposes. The Court points out, *ante*, at 187, that it may sometimes be difficult to distinguish a condition on importation from a prohibition on importation containing exceptions. That may be true, but since we are agreed that only prohibitions and not conditions come within the meaning of embargo, that ambiguity will have to be grappled with under the Court's view of things no less than under mine. It is irrelevant to the present issue, unless the existence of one ambiguity within a statute justifies the needless creation of another. Under my analysis, when a provision has been identified as an import prohibition (however difficult that may be—and it is neither difficult nor contested here) that is an end of the matter. Under the Court's analysis, one must proceed further to examine the exceptions to the prohibition and its purpose.

Today's decision leaves some doubt as to what prohibitions on importation other than § 526(a) are not governmental, and hence not embargoes, because they benefit private parties and are avoidable by private consent. Even if the Court's holding can be limited to prohibitions that protect private "rights," then at least the status of the prohibitions on the importation of goods that infringe trademarks or copyrights is called into question. See 15 U. S. C. § 1124; 17 U. S. C. §§ 601–603. And since, as noted earlier, the purpose of protecting private "rights" (whatever that might mean) is logically no more invalidating than the purpose of protecting private "interests," or even, more broadly, nongovernmental interests, the status of other import prohibitions is cast in doubt as well.

These uncertainties arise from today's particular departure from the meaning of "embargo" as "a governmental prohi-

bition on importation." Much greater, unfortunately, are the uncertainties that arise from today's acknowledgment of the principle that departure is permissible. Having cast § 526(a) loose from the moorings of its language, we leave it to drift on the currents of lawyerly invention. It remains to be seen what other limitations on the ordinary meaning of "embargo," no more apparent to the naked mind than the present one, may exist.