18 F.3d 1581
 CONOCO, INC., Citgo Petroleum Corporation and Lake Charles
Harbor and Terminal District, Plaintiffs-Appellants,
v.
The UNITED STATES FOREIGN-TRADE ZONES BOARD; Barbara H.
Franklin, Secretary of Commerce, as Chairman and Executive
Officer of the Foreign-Trade Zones Board; Nicholas F.
Brady, Secretary of the Department of the Treasury, as
Member of the Foreign-Trade Zones Board; Michael P.W.
Stone, Secretary of the Army, as a Member of the
Foreign-Trade Zones Board and John J. Da Ponte, Jr.,
Executive Secretary of the Foreign-Trade Zones Board,
Defendants-Appellees.
 No. 92-1396.
 United States Court of Appeals,
Federal Circuit.
 March 15, 1994.
 
 William F. DeMarest, Jr., Holland & Hart, Washington, DC, argued for plaintiffs-appellants. With him on the brief was Adelia S. Borrasea. Also on the brief was Charles M. Floren, CITGO Petroleum Corp., of Tulsa, OK.
 Mark S. Sochaczewsky, Attorney, Commercial Litigation Branch, Dept. of Justice, New York City, argued for defendants-appellees. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Attorney in Charge, International Trade Field Office.
 John G. Kester and David D. Aufhauser, Williams & Connolly, of Washington, DC, were on the brief for amicus curiae, Phibro Energy, Inc. and Phibro Energy USA, Inc.
 Before RICH and PLAGER, Circuit Judges, and COHN, District Judge.*
 PLAGER, Circuit Judge.
 
 
 1
 In this case we are called upon to determine what court, if any, has jurisdiction to review certain orders of the Foreign Trade Zones Board (Board or FTZB), an agency of the federal government.[1] Appellants appeal the April 7, 1992 judgment of the Court of International Trade, Court No. 90-06-00289, dismissing for lack of jurisdiction this action--a challenge to the Board's imposition of conditions on the grant of foreign subzone status to refineries operated by the two private appellants, Conoco, Inc. (Conoco) and CITGO Petroleum Corp. (Citgo). Conoco, Inc. v. United States Foreign Trade-Zones Bd., 790 F.Supp. 279 (Ct.Int'l Trade 1992). We reverse and remand.
 
 I. BACKGROUND
 
 2
 There are three appellants in this action--two private and one public. The two private appellants are Conoco and Citgo. The one public appellant is the Lake Charles Harbor and Terminal District (District). The Board has authorized the District to establish, operate and maintain a foreign trade zone[2] adjacent to or in Lake Charles Harbor, a port of entry into United States customs territory. Conoco and Citgo are the owners of oil refineries located outside the zone. During 1986-87, the District filed applications on their behalf with the Board asking that these refineries be granted subzone status.[3] The Board granted these applications subject to the following conditions:
 
 
 3
 (1) that duties be paid on foreign crude oil used as fuel (or refined into products used as fuel) in the refineries; and
 
 
 4
 (2) that Conoco and Citgo elect "privileged foreign status" for foreign crude oil brought into their respective subzones, i.e., elect to pay duties on the value of that crude oil as opposed to the value of refined products produced therefrom.[4]
 
 
 5
 It is the imposition of these conditions on the grant of subzone status that lies at the heart of this case. Pursuant to the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 et seq. (1988), two of the appellants, Conoco and the District, challenged in the United States District Court for the Western District of Louisiana, Lake Charles Division, the Board's imposition of these conditions.[5] The government responded that, under the law, exclusive jurisdiction lay in the Court of International Trade, and moved to dismiss the action for lack of subject matter jurisdiction in the district court. In a judgment dated June 25, 1990, Civil Action No. 89-1717-LC, the district court, pursuant to the government's motion, dismissed the action.
 
 
 6
 All three appellants then filed their action in the Court of International Trade in New York. When they subsequently filed a motion for judgment upon the agency record[6], the government filed a cross-motion to dismiss for lack of subject matter jurisdiction. In support of its motion, the government argued that no court had jurisdiction to review the action of the Board. The government pointed to the fact that Congress, in the Foreign Trade Zones Act of 1934 (FTZA) (codified as amended at 19 U.S.C. Sec. 81a et seq. (1988)), made specific provision for the review of zone or subzone grant revocations[7], but failed to provide for review of other Board actions, such as those involved here. This, according to the government, evidenced Congress' intent that there not be judicial review of these other actions.
 
 
 7
 In the alternative, the government argued that neither of the possible jurisdictional paths otherwise applicable for Court of International Trade review, subsections (a) and (i) of 28 U.S.C. Sec. 1581 (1988), were available. These two subsections read:
 
 
 8
 (a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930 [codified as amended at 19 U.S.C. Sec. 1515 (1988) ].
 
 
 9
 * * * * * *
 
 
 10
 (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section ..., the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--
 
 
 11
 (1) revenue from imports or tonnage;
 
 
 12
 (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
 
 
 13
 (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
 
 
 14
 (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section....
 
 
 15
 Under subsection (a), according to the government, the action was premature because Conoco and Citgo had not pursued the protest procedure through Customs. This procedure would require Conoco and Citgo to activate their respective subzones, import foreign crude oil therein, have Customs assess duties on that oil, pay those duties, file a protest with Customs, and then await the decision of Customs to deny the protest--all before filing suit to challenge the conditions the Board imposed on the grant of the subzone. Under subsection (i), according to the government, the action was barred because appellants had not met the threshold requirement of showing that the protest procedure and subsequent review provided by subsection (a) would be "manifestly inadequate."[8]
 
 
 16
 In a judgment dated April 7, 1992, the court denied appellants' motion and granted the government's motion. The court castigated the government for playing "jurisdictional ping-pong" but concluded nonetheless that the action was premature under subsection (a) and barred under subsection (i). It did not reach the alternative argument--that no court had jurisdiction to review the action. This appeal followed.
 
 II. DISCUSSION
 A.
 
 17
 We first address the question of whether any court has jurisdiction to review these actions of the Board. Before the Court of International Trade, the government maintained that no provision of the Foreign-Trade Zones Act (FTZA), 19 U.S.C. Sec. 81a-u (1988), makes Board determinations to either grant foreign-trade zones or attach conditions to such grants subject to judicial review. According to the government, judicial review is available only in cases involving the revocation of foreign-trade zone grants pursuant to subsection 81r of the statute.[9]
 
 
 18
 On appeal to this court, the government argues that, since the Court of International Trade did not make any express determination on this issue, we need not reach it. But the court's decision was premised on the conclusion that invocation of its jurisdiction was premature, not that it was nonexistent. Further, and more to the point, the government's effort to avoid the issue might have some force if we agreed with the court's interpretation of the statutory provisions which, according to the court, require appellants to engage in certain additional administrative activity before they can invoke the court's jurisdiction. Since we do not agree, and believe that, if appellants' claims are reviewable at all, they are ripe for decision, we must determine if the agency actions objected to by appellants are subject to that review.
 
 
 19
 At oral argument, the question of whether there was judicial review of the matter at issue was the subject of discussion between court and counsel. Eventually the following colloquy ensued between counsel for the government and members of the court:
 
 
 20
 Government Counsel (GC): Well, the original determination of the district court was that you go to the CIT [Court of International Trade]. The CIT implicitly assumed that that was correct.
 
 
 21
 The Court: Do you think that's correct?
 
 
 22
 GC: It's a very confusing area, as you can understand.
 
 
 23
 Court: Yes, all right. What's the government's position? What is the correct answer? You're the government. What is the correct answer.
 
 
 24
 GC: The government's position as stated in this case is that, the trial court's determination that, the underlying purposes and the underlying determination which is reviewed by the Customs Service can be reviewed by the CIT, can in fact be reviewed by the CIT.
 
 
 25
 Although counsel's response was somewhat confusing--it referred to determinations reviewed by the Customs Service, when the question here is a determination of the FTZB--it could be read as a concession that jurisdiction in this class of case properly lies in the Court of International Trade.[10] We are not prepared to rest on that, however, particularly since counsel subsequently further qualified his statement by saying that, "I can only speak, as your Honor probably recognizes, for the government in this case." Accordingly, we address the question independently of the government's posture at argument.
 
 
 26
 The statute, 19 U.S.C. Sec. 81, which contains the provisions establishing the Board and detailing its mission and authority, contains a subsection, 81r, dealing with Board orders that revoke previously granted zones. The subsection provides that an order revoking a grant is final and conclusive unless the grantee appeals within 90 days "to the court of appeals for the circuit in which the zone is located...."
 
 
 27
 This is the only statement in the statute of Congressional intent regarding judicial review of Board orders. The statute leaves unsaid what is to be done with orders of the Board other than orders of revocation. The most that can be said for the statute is that, if these other orders are judicially reviewable, jurisdiction-granting authority must be located in other legislation. The least that can be said for the statute is that it falls far short of a clear declaration of Congressional intent regarding reviewability of these other orders.
 
 
 28
 It is well established that judicial review of agency action is to be presumed, absent clear and convincing evidence of Congressional intent to the contrary. See, e.g., Traynor v. Turnage, 485 U.S. 535, 542, 108 S.Ct. 1372, 1378-79, 99 L.Ed.2d 618 (1988) (citing Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135-36, 90 L.Ed.2d 623 (1986) and Abbott Lab. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511-12, 18 L.Ed.2d 681 (1967)). The language, or absence of it, in this statute regarding judicial review cannot constitute the clear and convincing evidence required to bar such review. See Abbott Lab., 387 U.S. at 141, 87 S.Ct. at 1511-12 (the mere fact that a statute provides for review of certain enumerated actions is insufficient evidence of congressional intent to foreclose review of other actions).
 
 
 29
 The fact that a particular review route was specified for revocations is not inconsistent with this conclusion. As we explain below, the two judicial candidates for jurisdiction to review these other orders are the district courts, under their general APA jurisdiction, and the Court of International Trade, under its exclusive jurisdiction over civil actions relating to customs and tariffs. In either case, the review would begin at the trial level, and not reach a court of appeals until sometime later. Congress may well have simply intended that revocation orders, because of their impact on already established rights of the parties, be reviewed by direct appeal to the appropriate courts of appeal. In any event, we have no difficulty in holding that the orders of the FTZB, absent a clear and unequivocal expression of Congressional intent to the contrary, are generally subject to judicial review in accordance with established principles of law.[11] We turn then to the question of where that review lies.
 
 B.
 
 30
 If jurisdiction lies in district courts for review of these orders, it must lie there because of the general grant of jurisdiction in 28 U.S.C. Sec. 1331 (1988) over causes of actions created in Sec. 10(c) of the APA, 60 Stat. 243 (1946) (codified as amended at 5 U.S.C. Sec. 704 (1988)). If it lies in the Court of International Trade, it is because of the exclusive grant to the Court of International Trade of jurisdiction over various trade and tariff matters contained in 28 U.S.C. Sec. 1581. When Congress amended 28 U.S.C. Sec. 1581 to add subsection (i) in 1980, it reiterated its purpose to grant the Court of International Trade broad exclusive jurisdiction "over any civil action against the United States arising out of the federal statutes governing import transactions." H.R.Rep. No. 1235, at 21, reprinted in 1980 U.S.C.C.A.N. at 3729, 3732. Congress wanted to "eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the district courts and the Court of International Trade." H.R.Rep. No. 1235, at 47, reprinted in 1980 U.S.C.C.A.N. at 3759. And it wanted to "eliminate much of the difficulty experienced by international trade litigants who in the past commenced suits in the district courts only to have those suits dismissed for want of subject matter jurisdiction," as well as to "ensure that these suits will be heard on the merits." Id.
 
 
 31
 It is thus apparent from the legislative history of Sec. 1581 and from the broad grant of exclusive jurisdiction given to the Court of International Trade that Congress had in mind consolidating this area of administrative law in one place, and giving to the Court of International Trade, with an already developed expertise in international trade and tariff matters, the opportunity to bring to it a degree of uniformity and consistency. Obviously that would not be possible if jurisdiction were spread among the district courts throughout the land.
 
 
 32
 We conclude then that, consistent with Congress' intent, if jurisdiction can be found to lie under the provisions of Sec. 1581, such jurisdiction would place exclusive judicial review of the issues raised by appellants in the Court of International Trade.[12] Only if no jurisdictional grant can be found in the Court of International Trade would it be appropriate to invoke the general administrative review function of the district courts in such cases.
 
 C.
 
 33
 There are two subsections of Sec. 1581 which plausibly give appellants a route for judicial review by the Court of International Trade of the issues they wish to raise. The first, subsection (a), provides for review of a denial by the Customs Service of a protest over a specific tariff. As we noted earlier, this would require the private appellants to activate their zones and go through the steps leading up to such a protest denial.[13] This is the route the government urges as the only one, if any, open to appellants, and it is appellants' failure to follow that route that led the Court of International Trade to declare their appeal premature.
 
 
 34
 Appellants argue that subsection (a) cannot apply here because Customs does not have the power or authority to overturn an action by the Board, a separate agency.[14] Moreover, argue appellants, the Court of International Trade, on appeal from Custom's denial of a protest, would likewise not be able to overturn this action by the Board both because the Board would not be a party to the appeal, and because the record supporting the Board's action would not be before the Court of International Trade.
 
 
 35
 The government responds that the statute, 19 U.S.C. Sec. 1514(a) (1988), that governs Customs' review of protest matters indicates Customs does have authority to effectively review actions by the Board in a protest proceeding. The language the government points to refers to matters subject to review in a protest, and states that the review "includ[es] the legality of all orders and findings entering into the same."[15] But that language is cabined within a statute relating to customs duties and tariffs, and is further qualified by the provision referring to charges or exactions "within the jurisdiction of the Secretary of the Treasury."[16] The Treasury Act cannot fairly be read to authorize Customs to review actions of a separate board, not under the jurisdiction of Treasury, in making a grant of a subzone or in imposing conditions on a grant. We conclude, then, that subsection (a) is not intended to provide an effective jurisdictional vehicle for these appellants to bring their issues before the court.[17]
 
 
 36
 This conclusion is fully supported by Luggage and Leather Goods Manufacturers of America v. United States, 588 F.Supp. 1413 (Ct.Int'l Trade 1984) and United States Cane Sugar Refiners' Association v. Block, 544 F.Supp. 883, 887 (Ct.Int'l Trade 1982), aff'd, 683 F.2d 399, 402 n. 5 (CCPA 1982). In Luggage and Leather Goods Manufacturers, a domestic trade association and a labor union challenged the legality of a presidential order designating certain categories of articles as eligible for duty-free treatment. The Court of International Trade held that it could exercise jurisdiction under subsection (i), notwithstanding the potential availability of subsection (b) of 35 U.S.C. Sec. 1581[18] and plaintiffs' failure to exhaust before filing suit the protest procedure referred to in that subsection, because the presidential order was "a matter outside the authority of the Customs Service." Id. at 1420-21. Pursuit of a remedy through that procedure would have been "futile and inappropriate." Id. at 1421.
 
 
 37
 In United States Cane Sugar Refiners' Association, an association of sugar refiners challenged a presidential proclamation imposing import quotas on sugar. The Court of International Trade held that it could exercise jurisdiction under subsection (i), notwithstanding the potential availability of subsection (a) and the association's failure to exhaust before filing suit the protest procedure referred to in that subsection, because "[the] Customs officials [in the context of such a procedure] obviously have no authority to override the presidential proclamation and admit over-quota sugar." Id. at 887. Again, pursuit of a remedy through that procedure would have been "inequitable and an insistence of a useless formality." Id. On appeal, our predecessor court affirmed, although on a different ground--that members of the association would have been irreparably harmed if required to exhaust that procedure before filing suit.
 
 
 38
 The legislative history of subsection (a) is in accord. When Congress added subsection (i) to the statute in 1980, it amended subsection (a) to eliminate the language "legality of all orders and findings" appearing in the predecessor of that statute.[19] Congress dropped this language after concern was expressed that its retention would allow a litigant, in the situation in which Customs has acted on behalf of another agency, to mount two attacks on the decision by that other agency. The litigant could first mount a direct attack, and if unsuccessful, mount a "collateral attack" under subsection (a). Hearings Before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary, 96th Cong., 1st Sess. 304-305 (1980); Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Comm. on the Judiciary, 96th Cong., 1st Sess. 23-24 (1979). Congress, by eliminating this language, apparently did not want subsection (a) to be used as a mechanism to mount collateral attacks on other agency decisions.
 
 
 39
 As noted earlier, the other subsection (subsection (i)) of Sec. 1581 was intended to give the Court of International Trade broad residual authority over civil actions arising out of federal statutes governing import transactions, and to eliminate the confusion over whether jurisdiction lay in the Court of International Trade or the district courts. On its face, subsection (i) is straightforward and comprehensive. The language of subsection (i) granting to the Court of International Trade "exclusive jurisdiction of any civil action ... that arises out of any law of the United States providing for--," when coupled with the phrases in paragraph (i)(1) relating to "revenue from imports or tonnage" would seem easily to embrace the matters appellants raise here. The foreign-trade zones arise under laws designed to deal with revenue from imports, and they provide a special mechanism for determining revenue from materials imported into these zones.
 
 
 40
 In addition, paragraph (i)(4) refers to "administration and enforcement" with respect to the matters referred to in the earlier paragraphs, as well as those covered in subsections (a) through (h). Again, a straightforward reading of the statutory language indicates that the kinds of administrative conditions placed on the grant to appellants falls comfortably within the scope of that language.
 
 
 41
 The government argues, however, that the plain meaning of the statutory language in subsection (i) cannot be taken at its face, and that controlling precedent requires a narrower reading of the statute than the words connote. In support of this proposition, the government cites (or cited before the Court of International Trade) several cases, specifically K Mart Corp. v. Cartier, Inc., 485 U.S. 176, 108 S.Ct. 950, 99 L.Ed.2d 151 (1988); National Corn Growers Association v. Baker, 840 F.2d 1547 (Fed.Cir.1988); American Air Parcel Forwarding v. United States, 718 F.2d 1546 (Fed.Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984); United States v. Uniroyal, Inc., 687 F.2d 467, 475 (CCPA 1982); Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356 (Fed.Cir.1992); and Miller & Co. v. United States, 824 F.2d 961 (Fed.Cir.1987), cert. denied, 484 U.S. 1041, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988).
 
 
 42
 In K Mart, the Court of Appeals for the District of Columbia had held that the term "embargoes," used in paragraph (3) of subsection (i), did not give the Court of International Trade jurisdiction over certain "gray-market" goods, the importation of which was prohibited by Sec. 526(a) of the Tariff Act of 1930, codified as amended, 19 U.S.C. Sec. 1526 (1988).[20] The Supreme Court, although employing a different meaning of the term, arrived at the same conclusion.
 
 
 43
 The Court found no reason to depart from the ordinary meaning of the term "embargo," which it concluded meant a governmentally imposed quantitative restriction. Id. 485 U.S. at 185, 108 S.Ct. at 957. Thus the statute did not give jurisdiction to the Court of International Trade over Sec. 526(a) cases, cases which amounted essentially to private enforcement actions on behalf of trademark owners. In reaching its decision the Court rejected both the Court of Appeals' interpretation of the term, which was keyed to embargoes that are grounded in trade policy, and petitioner 47th Street Photo's interpretation, which would have given the term a highly expansive reading based on a presumed Congressional intent to give the Court of International Trade the broadest possible jurisdiction. In rejecting petitioner's argument, the Court noted that Congress had drawn some fairly clear lines in the statute, and saw no reason to go beyond what Congress had written. The Court also noted that the Court of International Trade had rarely dealt with, much less developed a "specialized expertise" in general trademark law. Id. at 189, 108 S.Ct. at 959.
 
 
 44
 In the case before us, there is little ground for dispute as to what is within the concept of "revenue from imports," or what "administration and enforcement" means with regard to matters relating to revenue from imports. Furthermore, there can be no question that we are here dealing with issues of governmental law and policy regarding customs and tariffs, the type of issues with which the Court of International Trade is acknowledged to have expertise. K Mart directs that in determining the jurisdiction of the Court of International Trade under Sec. 1581 we stay within the parameters of the statute. That of course is unassailable advice; we have no difficulty in finding within the parameters of subsection (i) the precise terms needed to cover the issues here.
 
 
 45
 In National Corn Growers, we held that a domestic producer, challenging a decision by Customs to allow the importation of merchandise at what the producer considered to be an unlawfully low rate, could not obtain jurisdiction in the Court of International Trade under subsection (i) because the proper jurisdictional path for such a challenge was subsection (b). The producer had argued that relief under subsection (b) was manifestly inadequate under the authority of Luggage & Leather Goods Manufacturers Id. at 1556. We disagreed, recognizing the distinction between a decision which the Customs Service had no authority to override, and a decision which was "within the ambit of the Customs Service to correct." Id.
 
 
 46
 The remaining cases cited by the government all involved situations in which proceedings under other subsections of Sec. 1581 could have provided effective review of the challenged action. In American Air Parcel, the available procedure was an accelerated protest proceeding followed by judicial review under subsection (a). Id. at 1550-51. In Uniroyal, it was a protest proceeding followed by judicial review under subsection (a). Id. at 472. In Norcal/Crosetti Foods, it was a protest proceeding followed by judicial review under subsection (b). Id. at 360. In Miller, it was an administrative review of a countervailing duty order followed by judicial review under subsection (c). Id. at 964. Thus, none of these cases support the government's position.
 
 
 47
 The government's final argument, brought for the first time on appeal, is that appellants are foreclosed from proceeding under subsection (i) because they have not shown that relief under subsection (h) would be manifestly inadequate.[21] We disagree. Subsection (h) provides a limited mechanism for obtaining prospective relief from an action (or refusal to act) by Treasury. See H.R.Rep. No. 1235, at 46, reprinted in 1980 U.S.C.C.A.N. at 3758. Thus, it suffers from the same infirmity as subsection (a)--it cannot provide effective review of an action of the Board, an agency independent of Treasury.[22]
 
 
 48
 We conclude that the Court of International Trade erred by acquiescing to the government's arguments and not exercising jurisdiction under subsection (i).[23] The protest procedure is manifestly inadequate. More to the point, this action is facially embraced by subsection (i)(1).[24] Appellants should have been allowed to proceed under subsection (i). Notwithstanding that Judge Carman, writing for the Court of International Trade, felt compelled by precedent to hold that his court lacked jurisdiction because the suit was premature, he expressed the following personal sentiments:
 
 
 49
 This Court feels compelled to express its sense of exasperation and frustration with the results of this case. Individuals and firms are often required to expend an inordinate amount of time and money to obtain judicial review in this Court. They are required to navigate arcane jurisdictional passages. They waste time and resources fighting over jurisdiction and oftentimes they are denied a chance to be heard on the merits of the case. These obstacles unnecessarily increase cost and hurt the efforts of the United States to be competitive in the international community.
 
 
 50
 790 F.Supp. at 288-89.
 
 
 51
 Judge Carman states well the reasons why Congress granted to the Court of International Trade the jurisdiction it did. It is time to bring to an end the unproductive jurisdictional ping-pong games, and to give litigants their right to expeditious and timely decisions on the merits of their claims.
 
 III. CONCLUSION
 
 52
 For all the foregoing reasons, we reverse the decision of the Court of International Trade dismissing the action for lack of subject matter jurisdiction, and remand the case to that court for an adjudication on the merits.
 
 REVERSED AND REMANDED
 
 
 *
 Honorable Avern Cohn, District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Board is a governmental entity which has the authority to grant to corporations the privilege of establishing, operating, and maintaining a foreign trade zone in the United States. See 19 U.S.C. Sec. 81b(a) (1988)
 
 
 [2]
 A foreign trade zone is a geographical area located adjacent to or in a port of entry into the United States. See 19 U.S.C. Sec. 81b (1988). The grantee of a zone--District here--has the authority to permit others to operate within the zone subject to the approval of the Board. See 19 U.S.C. Sec. 81m (1988). A company operating within the zone can import foreign merchandise into the zone and manufacture finished merchandise therefrom. See 19 U.S.C. Sec. 81c (1988). It can elect whether to pay duties on the foreign merchandise when it is imported into the zone, or on the finished merchandise when it is imported into U.S. customs territory for domestic consumption. The company can thus take advantage of any favorable differential between the rate of duty for the foreign merchandise and that for the finished merchandise. See Armco Steel Corp. v. Stans, 431 F.2d 779, 782 (2d Cir.1970)
 
 
 [3]
 A subzone has all the characteristics of a zone except that it is an area separate from an existing zone. See 15 C.F.R. Sec. 400.304 (1991). It can only be created when a company cannot be accommodated within the zone. Id. Only the grantee of the zone can apply for subzone status. See 15 C.F.R. Sec. 400.106 (1991). That is why the District applied for subzone status on behalf of Conoco and Citgo
 
 
 [4]
 A third condition, immaterial for purposes of this appeal, was imposed and subsequently revoked by the Board on March 27, 1991
 
 
 [5]
 On the merits, appellants claim that the Board's action is arbitrary and capricious in view of the Board's failure to impose these conditions in like circumstances in five instances prior to March of 1988. Appellants also claim that the Board's action is inconsistent with their right to elect whether to pay duties on foreign crude or on refined products produced therefrom
 
 
 [6]
 Pursuant to Rule 56.1 of the Rules of the Court of International Trade
 
 
 [7]
 See 19 U.S.C. Sec. 81r(c)
 
 
 [8]
 This threshold requirement does not appear in the statute, but finds expression in certain of our precedents. See, e.g., Miller & Co. v. United States, 824 F.2d 961, 963 (Fed.Cir.1987), cert. denied, 484 U.S. 1041, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988). It may have a basis in the prefatory "[i]n addition to" language of subsection (i). See United States v. Uniroyal, Inc., 687 F.2d 467, 475 (CCPA 1982) (Nies, J., concurring). It presumably serves the purpose of carrying out Congress' intent that subsection (i) be a "residual" grant of jurisdiction, and not be used to routinely bypass the "traditional method" of obtaining judicial review of international trade disputes involving Customs--filing a protest and then seeking judicial review if Customs denies the protest. H.R.Rep. No. 1235, 96th Cong., 2d Sess. 47 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3758
 
 
 [9]
 As Amici Curiae Phibro Energy noted, the same contention has been made in its case, also on appeal to this court, and involving the same issue. See Phibro Energy, Inc. v. Barbara H. Franklin, 822 F.Supp. 759, 760-61 (Ct.Int'l Trade 1993), appeal docketed, No. 93-1389 (Fed.Cir. June 4, 1993); see also Brief for Defendants (Government) at 2, id. That appeal has been stayed pending decision in Conoco. No. 93-1389 (Fed.Cir. July 12, 1993)
 
 
 [10]
 It is also possible that counsel was obfuscating his answer by referring to judicial review of Custom's decisions under subsection (a), about which there was never any question
 
 
 [11]
 We likewise reject the government's argument that the Board's action is subject to limited review, i.e., that it can only be reviewed for procedural correctness. For authority, the government relies on Florsheim Shoe Co., Division of Interco, Inc. v. United States, 744 F.2d 787 (Fed.Cir.1984) and West Bend Co., Division of Dart Industries v. United States, 576 F.Supp. 630 (Ct.Int'l Trade 1983). However, these cases involve challenges to actions by the President which are entitled to great deference by the judiciary. Actions by the Board are not entitled to the same degree of deference
 
 
 [12]
 See K Mart v. Cartier, Inc., 485 U.S. 176, 182-83, 108 S.Ct. 950, 956, 99 L.Ed.2d 151 (1988) ("The District Court would be divested of jurisdiction ... if this action fell within one of several specific grants of exclusive jurisdiction to the Court of International Trade.")
 
 
 [13]
 Sometime after this suit was filed in the CIT, Citgo activated its zone, and has since filed a tariff protest with the Customs Service. As explained, that route does not provide an adequate vehicle for the APA-type review being sought here of the Board's conditions, and thus Citgo's actions are immaterial to this suit
 
 
 [14]
 Customs is part of the Treasury Department, while the Board is a separate executive agency consisting of the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of the Army. See 19 U.S.C. Sec. 81a(b) (1988). The Secretary of Commerce functions as the chairman and executive officer of the Board. Id
 
 
 [15]
 That section reads in relevant part:
 [D]ecisions of the appropriate customs officer, including the legality of all orders and findings entering into the same, as to--
 (3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury ...
 shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade in accordance with chapter 169 of title 28 within the time prescribed by section 2636 of that title.... (Emphasis added).
 
 
 [16]
 That phrase appeared for the first time in Sec. 514 of the Treasury Act of 1922, 42 Stat. 969 (1922), a predecessor to 19 U.S.C. Sec. 1514(a). It did not appear in the House bill, but was subsequently added without comment in the associated reports. Accordingly, we take it to have its normal meaning: issues within the power or authority of Treasury to decide
 
 
 [17]
 Accord K Mart Corp. v. Cartier, Inc., 485 U.S. 176, 190-91, 108 S.Ct. 950, 959-60, 99 L.Ed.2d 151 (1988): "The 'protest' referred to in subsection (a) is an administrative remedy available to challenge specified decisions by Customs officers.... Petitioner acknowledges that the present action is not a protest...."
 
 
 [18]
 Subsection (b) reads:
 (b) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516 of the Tariff Act of 1930 [codified as amended at 19 U.S.C. Sec. 1516 (1988) ].
 Section 516 of the Tariff Act of 1930, codified as amended, 19 U.S.C. Sec. 1516 (1988), provides to a domestic competitor, not directly involved in the specific import transaction, the right to initiate a protest proceeding with Customs with respect to that transaction.
 
 
 [19]
 The immediate predecessor of that statute, Pub.L. 91-271, 84 Stat. 278 (1970) (codified as 28 U.S.C. Sec. 1582(a) (1970)), read in relevant part:
 The Customs Court shall have exclusive jurisdiction of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, where the administrative decision, including the legality of all orders and findings entering into the same, involves ... (3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury.... (Emphasis added).
 
 
 [20]
 Gray-market goods are foreign-manufactured goods, bearing a United States trademark, which are imported without the consent of the United States trademark owner. See K Mart, 485 U.S. at 179, 108 S.Ct. at 954
 
 
 [21]
 That subsection reads:
 (h) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.
 
 
 [22]
 The government's argument--that the Secretary of the Treasury is a member of the Board, and thus could conceivably induce the Board to reverse its action upon a request by appellants--hardly needs response
 
 
 [23]
 Accordingly, we do not need to address appellants' alternative arguments that a threshold showing of manifest inadequacy is not required under the circumstances of this case, and that the Court of International Trade's failure to exercise jurisdiction under subsection (i) was a violation of due process
 
 
 [24]
 We have concluded that, as applied to this case, the FTZA is a statute "providing for revenue from imports." See Luggage and Leather Goods Mfrs. of Am. v. United States, 588 F.Supp. 1413, 1419 (Ct.Int'l Trade 1984). Thus, we reject the conclusion of the Court of International Trade in Phibro Energy, Inc. v. Barbara H. Franklin, 822 F.Supp. 759, 764 (Ct.Int'l Trade 1993) that the FTZA per se governs export transactions only. The Court's conclusion was based on isolated statements in the legislative history, and ignores commercial realities