**AMERICAN NATIONAL FIRE INSURANCE CO. and Great American Insurance Co., Plaintiffs,**

v.

**MIRASCO, INC., Defendant.**

**Mirasco, Inc., Plaintiff,**

v.

**American National Fire Insurance Company, Defendant.**

**No. 99 Civ. 12405(RWS).**

United States District Court, S.D. New York.

March 10, 2003.

Kingsley & Kingsley by Harold M. Kingsley, Hicksville, NY, for American National Fire Insurance Co.

Haight Gardner Holland & Knight by John M. Toriello, James V. Marks, New York City, for Mirasco, Inc.

## OPINION

SWEET, District Judge.

American National Fire Insurance Company ("American National") and Great American Insurance Co. ("Great American") (collectively the "Insurers"), the plaintiffs in 99 Civ. 12405 (the "New York Action") and defendants in 00 Civ. 5098 (the "Georgia Action"), have moved against Mirasco, Inc. ("Mirasco"), defendant in the New York Action and plaintiff in the Georgia Action, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 in this dispute regarding a coverage issue under the rejection coverage of an ocean marine transportation policy. Mirasco has cross-moved for summary judgment in the Georgia Action.

For the following reasons, the Insurers' motion is granted in part and denied in part, and Mirasco's cross-motion is denied.

### Prior Proceedings

The Insurers commenced the New York Action on December 22, 1999, seeking a declaration that they were not obligated to pay Mirasco's losses under the policy. Mirasco asserted a counterclaim against the Insurers under Georgia law for breach of contract and bad faith.

On March 8, 2000, Mirasco commenced the Georgia Action against the Insurers in the Superior Court of Georgia, Fulton County, seeking compensatory and exemplary damages under Georgia law for the Insurers' breach of the policy and their bad faith denial of Mirasco's claim. The Insurers removed to federal court. After denying Mirasco's motion to remand, the Northern District of Georgia transferred the case to this Court on July 5, 2000.

The Insurers filed the instant motion on November 7, 2002. Mirasco cross-moved on December 6, 2002. Oral argument was held on January 15, 2003. Since that time, the parties have submitted at least six additional letters in support of their respective positions, the last of which was received on February 13, 2002, at which time the motion was considered fully submitted.

### Facts

As befits a summary judgment motion, the following facts are drawn from the parties' Rule 56.1 statements.

### The Parties

Mirasco is a Georgia corporation doing business as, *inter alia,* a trader and exporter of beef products from the United States to Egypt. Mirasco's officers and shareholders consist of three members of the Rizk family. Latif Rizk owns 50 percent of the stock, and his two sons Saher and Sami Rizk each own 25 percent of the stock. Mirasco was formed in 1983 and has been exporting beef livers to Egypt, as well as engaging in other business, since that time.

The Insurers are companies formed in Ohio with their principal places of business located in Ohio.

### The Policy

At the time of its formation, Mirasco retained Antonio Palmiotto ("Palmiotto") of International Insurance Brokers ("IIB") as its insurance broker and agent to procure ocean marine transportation and rejection insurance. Initially, Palmiotto placed the coverage with companies other than the Insurers. In 1990, Palmiotto sub-

mitted the existing policy to various insurers, including the Insurers, who agreed to issue that policy as "Open Cargo Policy No. OMP7375220" (the "Policy"). Originally effective March 15, 1990, it was rewritten effective March 15, 1996. It is undisputed that the Policy was in full force and effect at all times relevant to this action. Although the Policy was prepared by Mirasco's brokers, the Insurers approved the form and content of the Policy.

Several clauses of the original policy are discussed: the clause concerning Mirasco's insurance broker's roles, the Rejection Coverage, and the Sue and Labor Clause. Each are detailed below.

Clause 40 involved Mirasco's insurance broker's roles:

### CLAUSE 40: BROKERS

It is a condition of this policy and it is hereby agreed that International Insurance Brokers, Inc. is the Insured's broker and shall be deemed to be exclusively the agents of the Insured[ ] and not of These Insurers; any notice in connection with affecting this insurance which is given or delivered by or on behalf of These Insurers to International Insurance Brokers, Inc., including notice of cancellation, shall be deemed to have been delivered to the Insured.

Rejection insurance protects against the risk of rejection or condemnation of the insured goods by the government of the country of import for failure to meet, for instance, local health standards. *E.g., Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 965 (2d Cir.1980). The rejection coverage included by the Policy utilizes standard industry language and provides, in pertinent part:

### REJECTION COVERAGE

A.1. Subject always to the following conditions and exclusions this policy is extended to cover the risks of rejection or condemnation by the government of the country of import or of their agencies or departments during the period of this insurance.

\* \* \* \* \* \*

B. It is a condition of this insurance that:

1. The interest insured is produced, prepared and packed in accordance with regulations of the Government of Country of Origin and it is fit for export to the importing country.

2. Shipments are direct or held covered at a premium to be agreed.

C. In particular, this insurance does not cover claims arising from:

1. Non-compliance with any of the conditions above.

2. Loss of market.

3. Misdescription of the interest insured.

4. Non-compliance with any regulations in force in country of destination at the time interest attaches hereto.

5. Non-compliance with the labelling regulations in force in country of destination at time interest attaches hereto.

6. Any omission or error in the contract of sale or other document.

7. Non-compliance with or breach of any of the provisions or warranties set out in the terms and conditions of this policy.

D. In the event of any embargo or prohibition being declared or in being by importing country, no claim shall attach hereto in respect of such embargo or prohibition on any shipment sailing after the announcement or enforcement of such an embargo or prohibition. In re-

spect of shipments which have sailed prior to such announcement or enforcement, this insurance is only to pay the cost of return freight to country of export or up to that amount in event of re-export to any substitute destination.

The Policy also contained a Sue and Labor Clause:

### CLAUSE 34: SUE AND LABOR

In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for The Insured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense; safeguard and recovery of the said goods and merchandise, or any part thereof, without prejudice to this insurance; to the charges whereof These Insurers will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of The Insured or of These Insurers in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment.

In March 1999, the Insurers added an endorsement to the Policy that excluded rejection coverage for IBP products shipped to Egypt. Roger Ablett, the Insurers' underwriter, stated that the addition of the endorsement was necessary in order for the Insurers to exclude IBP products in Egypt from the rejection coverage of the Policy.

### Decree 465

On November 22, 1997, the Egyptian Government issued Decree 465, which, according to a translation provided by the Insurers, provided in part:

B) packets in which products must be firmly closed and healthy authorized. Moreover, the following information must be written, in a fixed unerasable material, on a card put inside the packet and also written outside it in [A]rabic (it might be written in two languages if [A]rabic is one):

its Certificate of Origin

product name and trade mark if exist

Importers' name and address

the authority which supervised the slay to [I]slamic sharia should be accredited by the trade office in the Certificate of Origin

slaughter house name

slay date.

As a result of Decree 465's labeling requirements, Mirasco marked all shipments with "Mirasco Misr" ("Misr"), one of Mirasco's largest customers, as the importer, even though a portion of the shipments was set aside for other customers. Misr would receive the product, clear it and turn over to Mirasco's other customers their portion of the shipment. Misr is a proprietorship organized under the laws of the nation of Egypt and maintains its principal place of business in Alexandria, Egypt. Misr is managed by Dr. Fadi Rizk, Latif Rizk's nephew and the first cousin of Sami and Saher Rizk. The Insurers claim, and Mirasco disputes, that Misr is controlled by Mirasco and used to facilitate clearing the cargo through Egyptian customs in light of Decree 465.

### Decree # 6

In October 1998, the Egyptian authorities rejected a shipment of beef livers imported by Hady Enterprises and produced by one of Mirasco's suppliers, Iowa Beef Products ("IBP"), due to purported labeling irregularities in violation of Decree 465. In a case filed in the District Court for the Northern District of Florida by IBP against Hady Enterprises, the court held after a bench trial that Hady's viola-

tion of Decree 465 was the sole cause of the enactment of Decree # 6.[1]

In late December 1998, Sami Rizk telephoned Scott Sanem ("Sanem") of IBP at his home in the United States to tell him that there was a possibility of a decree going into effect in Egypt that would ban the importation of all IBP products into Egypt. Sanem testified that Rizk described the decree as a "total embargo on all IBP goods into Egypt," and that Rizk had told him that the decree was already drafted and awaiting the signature of a government minister.

On January 3, 1999, the Egyptian government issued Decree # 6 (the "Decree"). The Decree became effective on January 14, 1999, when it was officially published. According to a translation provided by the Insurers, the Decree stated that "[a]n embargo is placed on trade with the American company I.B.P. Corp in the United States of America as well as with any company with which it is associated." The Decree did not apply to cargo shipped by Mirasco's other suppliers, Excel Corporation ("Excel") or Monfort, Inc. ("Monfort").

Mirasco asserts, and the Insurers contest, that the Decree did not apply under Egyptian law to any IBP cargo that was shipped prior to January 14, 1999.

In an e-mail dated May 19, 1999, one of the Insurer's agents, Pam Kobin, the Divisional Assistant Vice–President for Specialty Claims of Great American's Cincinnati, Ohio office, stated that the decree "was not an embargo [of a ship] but it certainly was a prohibition." Although Mirasco asserts otherwise, Kobin has attested that she was not the one responsible for denying Mirasco's claim but that the decision was made by personnel of the New York Ocean Marine Business Unit.

### The Beef Liver Shipment on the M/V Spero

Beginning in August 1998, the price of beef livers entered a decline that lasted for approximately one year due primarily to a collapse in the economy and currency of Russia, a major importer of beef livers. On December 14, 1998, Sami Rizk in Egypt sent a facsimile to his brother Saher Rizk in Atlanta, analyzing the supply and consumption outlook for beef livers for the first five months of 1999. He projected an oversupply by the end of May 1999 of 8900 metric tons of beef livers, calculated as the difference between a supply of 11,000 tons and consumption of only 2,100 tons.

On December 31, 1998, stevedores hired and paid for by Mirasco completed the loading of the M/V Spero in Houston, Texas. The cargo consisted of 219,072 cartons of beef liver, including 132,535 cartons of

---

1. The Court held:

Solely as the result of Hady Enterprises' shipment's failure to conform to Decree 465, the Egyptian government enacted [Decree No. 6] . . . The Court makes this determination for three reasons, each of which would alone suffice for the Court to find causation by a preponderance of the evidence. First, the timing of the series of events lead the Court to find that IBP has met its burden of establishing causation. Second, the Egyptian GAIEC official inspection report states that GAIEC rejected the liver shipment and, as a result of the shipment, issued [Decree No. 6]. . . . Third, IBP's correspondence with [the GAIEC Director] demonstrates that the IBP ban was based on the rejection of the IBP livers, due to improper labeling under Decree 465, exported in September 1998 by Hady Enterprises and imported into Egypt by Salem Abdel Hady. . . . The Court finds that but for Hady Enterprises' relabeling, repackaging, and exportation of the beef livers to Egypt, Egypt would not have sanctioned IBP.

*IBP, Inc. v. Hady Enterprises, Inc.*, No. 99 Civ. 402, slip op. at 16 (Feb. 26, 2002).

IBP products (60.5 percent of the shipment), for which Mirasco had paid $1,081,500; 60,502 cartons of Excel products (27.6 percent of the shipment), for which Mirasco had paid $562,570.21; and 26,035 cartons of Monfort products (11.9 percent of the shipment), for which Mirasco had paid $285,450.[2] The brands were not strictly segregated into different holds or hatches; instead, while Mirasco attempted not to break up lots of the same product, lots from different brands were stored together. The cartons of frozen beef liver were hard frozen and in apparently sound condition at the time of loading aboard the M/V Spero. In addition, the shipment was packed and labeled solely for Misr, but was to be sold to five customers, including Misr, upon the shipment's importation into Egypt.

After loading the cargo aboard M/V Spero in Houston, Mirasco obtained fifteen (15) bills of lading for carriage of the cargo to Alexandria, Egypt. Eight (8) bills of lading covered the IBP cargo, and seven (7) bills of lading covered the Monfort and Excel cargo.

The M/V Spero arrived in Alexandria on January 23, 1999. Yossif El Menoufy ("El Menoufy"), a representative of Sea Horse International ("Sea Horse"), which had been hired by the Insurers to investigate and report on the shipment, was present when the M/V Spero arrived and observed the later inspection of the Spero.

As discussed above, Decree # 6 had gone into effect after the M/V Spero's departure but prior to the M/V Spero's arrival. Thus Mirasco then unsuccessfully attempted to convince the Egyptian authorities that the IBP cargo of the M/V Spero should be exempted from the Decree because the shipment sailed prior to the issuance thereof.

### The Inspection

On February 16, 1999, Egyptian authorities conducted an inspection of the M/V Spero's cargo. The inspection consisted of three additional inspectors than was normal, and they spent an unusually long time on the vessel. The Insurers allege that the inspectors did not even sample the IBP products because of the Decree and that the inspectors took some samples of the Monfort and Excel beef livers, but were not able to take sufficient samples because of the mixed stowage. In addition, the inspectors found that discrepancies existed between the slaughter dates printed on the inside and outside labels of the Excel cargo.

Although Mirasco asserted that it was typically permitted to discharge from fifty to one hundred percent of its cargo after such inspections, this time the inspectors recommended that Mirasco be permitted to discharge 10 percent of the cargo per day for further inspection. Mirasco did not contest the findings of the inspectors, nor did it attempt to unload the 10 percent of cargo. Mirasco asserts that it did not do so because it wanted to receive the results of the laboratory analysis being conducted by the Egyptian authorities.

The next day, on February 17, 1999, one of the Rizk brothers telephoned J.R. Dollins ("Dollins") of Excel and followed up that phone conversation with a facsimile on Mirasco stationery:

> Following our telephone conversation this morning, please note that our Alex-

---

**2.** From October to December 1998, Mirasco had ordered the liver from its usual suppliers, IBP, Excel and Monfort. Prices during that time fluctuated from a low of $0.275 to a high of $0.34 per pound based on delivery to Mi-

rasco's warehouse in Houston, Texas. During that time, Sami Rizk received orders from various customers in Egypt for a portion of the beef livers planned to be shipped on the M/V Spero.

andria, Egypt office has notified us of the following observations when samples were taken by the Egyptian authorities:

1 Excel Ft. Morgan (86R)

— Scale ticket date Oct. 30; carton and insert show October production, bags show November

— Scale ticket date Nov. 13; carton and insert show November product, bags show October

2 Excel Friona (86E)

— All samples pulled showed one bag contains an insert while the other bag does not

At the moment we do not have the full details of the situation, and the extent of these packing mistakes. I will keep you updated on this matter.

Please advise plants of the above issues in order to place the necessary controls to avoid such mistakes.

### The Decision to Re–Export the Entire Cargo

On March 4, 1999, the Insurers claim that Sami Rizk of Mirasco wrote a letter to Mirasco's ship broker, Van Weelde, stating:

On January 14, 1999, a ministerial decree was issued by the Egyptian Ministry of Trade banning the U.S. company (IBP) from supplying Egypt.

The "Spero" contains about 1,600 tons of IBP which is overstowing 1,200 tons of other brands. Therefore, we are not able to discharge other brands as we are not allowed to discharge IBP.

We should have clear direction by March 10th on the resolution.

We appreciate the patience of the ship owners and hope that this unforeseen situation will be resolved very soon.

Mirasco states that the letter has not been authenticated and is unsigned. That letter was followed on March 9, 1999 by a facsimile from Mirasco stating in part that "the problem is only with the IBP product which comprises about 1600 tons onboard the Spero." Mirasco sought advice on the possibility of utilizing another vessel to shift cargo from the Spero to it in order to get rid of the IBP products.

On March 22, 1999, Misr sent a letter to Sea Horse. The Insurers have provided a translation of that letter,[3] which Mirasco contests, as follows:

Messrs. Sea horse co.

Alexandria

Subject: Frozen beef liver consignment on M/V Spero coming from USA which arrived on January 1/23/1999

Please be informed that up till now, the ban on the import of IBP brand was not lifted, this ban is according to the minister of [supply] decision No. 6/99, therefore we will not be able to discharge this brand from the above vessel, and it will be re-exported, we shall supply to you with the name of the vessel and the date of re-exportation, so you can cover the return freight by the insurance.

Please acknowledge and do the necessary.

Mirasco did not advise Excel that any health or sanitary deficiencies were found by the Egyptian authorities.

Also on March 22, 1999, Saher Rizk sent the following facsimile to Mirasco's insurance broker, IIB, to the attention of Palmiotto and Cathy Pennolino ("Pennolino"):

---

**3.** The translation provided in the Insurers' Rule 56.1 statement differed slightly from the translation provided as an exhibit to support that assertion. The following translation was that provided as an exhibit, rather than the one included in the Rule 56.1 statement.

After extensive attempts to have the ban on IBP brand product lifted in Egypt to no avail, we are in a position that we must discharge the M/V Spero and ship the IBP beef livers to another destination.

We have located, and are booking a vessel to take product from Alexandria, to another destination. We are evaluating some options and as such have secured 2 different rates.

The facsimile was followed up by a telephone conference on March 24, 1999, after which Pennolino made the following note: "Entire load coming back even the stuff that is not IBP. The other stuff was on the bottom and they could not get it to unload and government would not let them discharge and reload IBP. Will likely sell all in the States."

According to an unauthenticated e-mail message from Steven Leiker ("Leiker") of Monfort to Mirasco provided by the Insurers, Saher Rizk informed Leiker on March 23, 1999, that the Egyptian health authorities had rejected the Monfort beef liver because the boxes did not have the expiry date written in Arabic. Leiker purportedly responded in his e-mail that Monfort would only accept the return of any cartons that were not in fact stamped with the requisite expiry date, and that Mirasco should seek approval from the Egyptian government to sort the cargo accordingly.

On March 24, 1999, a meeting was held at Fadi Rizk's office in Alexandria. Captain Elbendary ("Elbendary") of Sea Horse, Latif Rizk, Sami Rizk and Fadi Rizk attended. After discussing other options, Mirasco requested the approval of the insurers to return the vessel to the United States. Elbendary agreed, noting that the Insurers would pay the return freight.

The same day, IIB submitted to Great American a return shipment contract with the owners of the M/V Spero for approval, stating that "[a]s you know time is of the essence as they are trying to get the vessel to sail tomorrow. If the vessel does not sail, it will be held up another 5 days or so."

On March 25, 1999, Mohamed El Shafy ("El Shafy") of Misr claims he was told by the Egyptian authorities that the entire shipment was rejected, but that the authorities refused to provide rejection certificates.[4] El Shafy was given, however, a certificate of re-exportation, which states, according to a translation provided by Mirasco, that "the shipment . . . needs to be re-exported . . . due to rejection by incoming."[5] Mirasco has also presented a translation of a supposed Egyptian customs document dated April 15, 1999, that had been given to El Shafy, which noted that the M/V Spero shipment had been re-exported "because it was refused by the Public Organization for Supervision of Imports and Exports without any responsibility on the Customs."

An agreement signed by Mirasco on March 25, 1999, and by the owners of the

---

4. The Insurers dispute this fact but do not point to any evidentiary support for their disagreement and therefore do not raise a dispute of material fact.

5. The Insurers dispute that this certificate means that the cargo was rejected but do not provide any evidentiary support for this assertion, and therefore fail to establish a dispute of material fact. In their own Rule 56.1 Statement (though not in their response to Mirasco's), the Insurers point to translations of two custom documents that do not state that the cargo was rejected. The documents do not, however, pertinently state that the cargo was not rejected. In the absence of such statement, the Insurers have failed to raise a genuine dispute and, in any case, failed to do so in the proper document, their response to Mirasco's Rule 56.1 statement.

M/V Spero on March 26, 1999, provided for the return of the cargo to Houston. It included the following recitation:

WHEREAS

A. Pursuant to a Gencon charterparty dated 9th day of December [1998] Made between the shipowners and Mirasco, the M/V Spero loaded at Houston, USA, a cargo of 2,780,208 net metric tons of frozen beef livers on [December 31, 1998] for Alexandria, Egypt, upon the terms and conditions of a contract evidenced by 15 bill of lading issued at Houston dated [December 31, 1998].

B. Upon the ship[']s arrival at Alexandria on [January 23, 1999], the customs authority banned discharging about 1600 metric tons shipped by an American supplier called IBP.

C. It has been agreed with the charterers and shippers to return the entire cargo to Houston or Riga.

***The Return of the Shipment***

The M/V Spero sailed from Alexandria on March 26, 1999, with all cargo still aboard.

Before the vessel arrived back in Houston, on April 15, 1999, Saher Rizk wrote to the United States government to advise them that the livers had remained in a vessel as shipped. No one from Mirasco ever advised the United States government that the cargo on the M/V Spero had been rejected for any health, sanitary or quality reasons, or for any unwholesomeness.

When the vessel arrived back in Houston, Mirasco caused surveys to be conducted of the cargo by Rebecca J. Whitehead.

Also present was John Zemanek, a surveyor from Captain I.S. Derrick's office. Whitehead inspected Establishment 86E for missing inserts. Of 1,031 cases inspected, six were missing one insert and one case was missing both inserts. Of the cases in Establishment 86R, Whitehead inspected 1969 cases and found 281 had non-matching dates, most of which were in the period of late October to early November.

The cargo was otherwise found in sound condition except for 387 cartons that thawed during the return trip due to stowage too close to heated fuel tanks. These cartons were destroyed, and the Insurers paid for them in the amount of $6,164 after the commencement of this lawsuit.

Mirasco marketed the rest of the rejected cargo to traders and buyers. The cargo was sold in the United States in May, June and July of 1999. Because the market had been steadily falling since August of 1998, the prices received by Mirasco for the M/V Spero cargo ranged as low as $0.115 per pound although the cargo had been purchased back in the fall of 1998 for as much as $0.34 per pound.

***The Rejection Notices***

On June 3, 1999, Mirasco presented Captain Elbendary with seven "Notices of Rejection" (the "Notices") covering the Excel and Monfort cargoes and apparently dated March 25, 1999.[6] El Shafy has testified that he received the Notices from Egyptian authorities in mid-May. According to a translation provided by Mirasco, the following consignments were rejected for the following reasons:

*Consignment 4:*

a. *Monfort:* health reasons;

---

**6.** The Insurers contest the validity of this Notices, even though their Sea Horse representative confirmed with the Egyptian authorities that the Notices were legitimate and without

presenting in their Rule 56.1 Statement any contradictory facts. As a result, the Insurers have failed to present a genuine dispute of fact.

b. *Excel:* noncompliance with Ministerial Decree No. 553/98 and Egyptian Standard No. 1473/91.

*Consignment 5:*

a. *Monfort:* health reasons;

b. *Excel:* noncompliance with Decree 465, Ministerial Decree No. 553/91 and Egyptian Standard No. 1473/91 (changes in smell).

*Consignment 6:* [7]

noncompliance with Decree 465, Ministerial Decree No. 553/91 and Egyptian Standard No. 1473/91

*Consignment 7:*

a. *Monfort:* health reasons;

b. *Excel:* noncompliance with Ministerial Decree No. 553/98 and Egyptian Standard No. 1473/91

*Consignment 8:* [8]

noncompliance with Decree 465, Ministerial Decree No. 553/91 and Egyptian Standard No. 1473/91

*Consignment 9:*

a. *Monfort:* health reasons;

b. *Excel:* noncompliance with Decree 465, Ministerial Decree No. 553/91 and Egyptian Standard No. 1473/91

*Consignment 10:*

a. *Monfort:* health reasons;

b. *Excel:* noncompliance with Decree 465, Ministerial Decree No. 553/91 and Egyptian Standard No. 1473/91 (changes in smell)

The Notices for Consignments 4 and 7 do not refer to mislabeling in violation of Decree 465 at all. The other five Notices refer to violations of Decree 465 in addition to references to health and sanitary deficiencies for rejection. None of the Notices referring to health and sanitary deficiencies were ever delivered or described by Mirasco to Excel or Monfort. Nor was any claim for the alleged health and sanitary deficiencies described in the Notices ever made by Mirasco to Excel or Monfort.

### Settlements with Beef Liver Suppliers

On May 25, 1999, Mirasco filed a claim with Monfort for "Rejected Monfort product" in the amount of $451,550, consisting of $285,450 for the price paid to Monfort plus extra expense. Later in May 1999, Monfort and Mirasco arrived at a settlement figure of $115,000, pursuant to a telephone conference between Leiker of Monfort and Sami Risk of Mirasco. The settlement was finalized on August 10, 1999. Mirasco never advised Monfort that there had been any rejection of the product for health or sanitary reasons or for any unwholesomeness. Monfort requested a rejection certificate from Mirasco, but never received one.

On June 9, 1999, Mirasco sent to IBP a statement of its alleged losses based on the sale price to Mirasco and an estimate of salvage. The letter reflected a loss of sales of $1,228,000 of the product shipped on the M/V Spero. Mirasco never advised IBP that there was any fault with the IBP product, and IBP never offered any compensation to Mirasco for its alleged M/V Spero losses.

On July 8, 1999, Mirasco and Excel agreed to settle the M/V Spero claim for $175,000. Mirasco had previously sought reimbursement for the labeling deficiencies cited by the Egyptian authorities. The Insurers claim that Mirasco had sought $932,000, but Mirasco contests that figure. Mirasco never advised Excel that any of the Excel cargo aboard the M/V

---

**7.** The brands were not separately identified.

**8.** The brands were not separately identified.

Spero had been rejected for any health reasons.

*Mirasco's Insurance Claims*

On April 6, 1999, IIB submitted a claim to Great American for $400,000 for return freight and $101,527.77 for demurrage. In support of its claim, Sami Rizk sent the following chronology to Sea Horse:

1. January 14, 1999—Written request from Mirasco to the Chairman of the Egyptian General Organization for Export and Import Control (GOEIC) requesting permission to allow IBP product on board Spero to enter Egypt due to the fact that vessel was in transit when the ban was established.

2. Several meetings between Mirasco staff and the U.S. Embassy Foreign Agriculture service staff.

3. January 31, 1999—Letter from Mirasco to the Egyptian Minister of Trade and Supply, requesting the exemption from the above produce from the ban.

4. February 4, 1999—Letters from Mirasco to (GOEIC) and Minister with copies of bills of lading providing shipment date prior to ban.

5. February 8, 1999—Letter from Mirasco to the Director of Egyptian Foreign Trade Department, with copies of bills of lading requesting entry.

6. (A) Several meetings between Mirasco and U.S. Embassy. (B) Several meetings between U.S. Embassy and GOEIC. (C) One meeting between U.S. Ambassador and Egyptian Minister of Trade and Supply.

7. February 21, 1999—IBP representative came to Egypt held several joint meetings with U.S. Embassy, GOEIC and Foreign Trade Department.

8. U.S. Embassy called Minister of Trade and Supply by telephone.

9. Several meetings between U.S. Embassy staff and Minister of Trade and Foreign Commercial Representation Division.

10. Several meetings between Mirasco staff and GOEIC, Ministry, Foreign Trade, Commercial Representation Office.

11. March 24, [1999]—Mirasco decided to return the goods to USA as a permission to discharge was not likely and holidays from March 25 to 30 and April 4 would further delay vessel.

Originally the insurance policy provided for a full premium for rejection coverage, which would be partially refunded in the event no claim under the rejection coverage was submitted. To avoid sending funds back and forth, however, the billing system was changed to allow the payment of the lower no-claim premium to be paid in the first instance, with the difference to be paid if and when a claim under the rejection was paid. After Mirasco filed its claim for return freight of $400,000, the Insurers billed Mirasco for the rest of the full premium. Mirasco paid the additional rejection premium. The Insurers allege and Mirasco contest that Mirasco's comptroller, Ibrahim Yacoub ("Yacoub"), protested to Mirasco's broker IIB by telephone about this charge. The Insurers rely on a note made by Pennolino of the conversation on April 6, 1999, stating the Yacoub had inquired about the additional premium, stating that it was not a rejection, and that Pennolino had informed him that " 'embargo' coverage is part of the Rejection Wording and the Rate Charged for Rejection is applicable to the Rejection Section of the Coverage."

By letter dated May 4, 1999, the Insurers denied Mirasco's claim. Afterward, IIB submitted a claims statement on behalf of Mirasco, on July 29, 1999, as follows:

| | Total | Prorated [FN1] |
|---|---|---|
| Quantity (net metric tons) | 2,780.208 | 2,742.106 |
| Invoice Value (CIF Alexandria) | $2,777,427.79 | $2,739,363.89 |
| Insured Value (110% of Invoice) | $3,065,170.57 | $3,013,300.28 |
| **Expenses:** | | |
| Return Freight | $ 400,000 | $ 394,513.11 |
| Demurrage | $ 175,000 | $ 172,601.67 |
| Egypt re-export fee | $ 27,774.29 | $ 27,393.65 |
| Return unloading/storage | $ 112,209.05 | $ 110,671.26 |
| Return wharfage | $ 7,982.20 | $ 7,872.81 |
| Handling and Labeling | $ 22,884.95 | $ 22,571.32 |
| Freight Cost | $ 36,215.26 | $ 35,718.94 |
| Label printing | $ 1,453.08 | $ 1,433.17 |
| Travel cost | $ 12,875.04 | $ 12,698.59 |
| USDA Certification | $ 659 | $ 649.97 |
| Courier | $ 522.54 | $ 515.38 |
| Other expenses | $ 1,400 | $ 1,380.81 |
| Total expenses | $ 798,975.41 | $ 788,025.67 |
| Salvage Value | $ 866,916.58 | $ 855,035.72 |
| Total claim amount | $2,987,229.40 | $2,946,290.23 |
| Less payment received | ($ 400,000) | ($ 400,000) |
| Net claim balance | $2,587,229.40 | $2,546,290.23 |

FN1. The prorated amount reflects a deduction of the Excel beef livers, which [were] mislabeled. The mislabeled quantity is approximately 38.102 net tons of product. The original quantity shipped was 847.328 net tons.

The formal claim statement did not account for the $115,000 settlement from Monfort or the $175,000 settlement from Excel for mislabeling. Mirasco states that it did not notify the Insurers of the settlements prior to this litigation because the Insurers had already denied all of Mirasco's claims, including those related to Excel and Monfort cargo. Moreover, Mirasco's counterclaim in this action reflects the receipt of those amounts.

The claim was denied on September 22, 1999. The Insurers declined to pay Mirasco for its claim on the M/V Spero cargo except for the $400,000 for return freight under the limited embargo coverage and $6,164 for the 347 cartons that deteriorated during the return voyage.

The Insurers also refer at great length to a legal proceeding allegedly initiated by Sea Horse in Alexandria in an attempt to clarify the documentation in connection with the return of the beef livers aboard the M/V Spero. Because Mirasco was not a party to that proceeding nor was it claimed to be, it cannot be estopped by any factual findings therein.

*Discussion*

**I. Standard of Review**

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall

grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

## II. *A Genuine Issue of Fact Precludes Summary Judgment on the Insurers' Claim of Fraudulent Filing*

■ The Insurers claim that they are entitled to judgment as a matter of law because Mirasco filed a false claim in that it did not reveal its settlements with Excel and Monfort with regard to mislabeling until after the commencement of this suit.

■ The knowing and willful submission of a fraudulent or false claim with intent to defraud by an insured seeking recovery under an insurance policy may vitiate the terms of the policy. *E.g., Fine v. Bellefonte Underwriters Ins. Co.,* 725 F.2d 179, 184 (2d Cir.1984); *Ingarra v. Gen. Accident/PG Ins. Co. of New York,* 273 A.D.2d 766, 768, 710 N.Y.S.2d 168, 171 (3d Dep't 2000) (*citing Saks & Co. v. Continental Ins. Co.,* 23 N.Y.2d 161, 165, 295 N.Y.S.2d 668, 242 N.E.2d 833 (1968)).[9]

The Formal Claim Statement submitted by Mirasco on July 29, 1999, claimed a total of more than $2.5 million in losses, after crediting the Insurers with $40,939.20 for labeling discrepancies on Excel cargo. No credit was given for Monfort mislabeling. Prior to the submission of the formal claim, Mirasco and Excel had agreed to settle the mislabeling claim for $175,000.[10] Also prior to the formal claim, Mirasco and Monfort had agreed to settle the mislabeling claims for $115,000, although that settlement was not finalized until August 10, 1999, after the formal claim was filed.[11]

There is no dispute that the formal claim did not evidence the pending or completed settlements totaling $190,000 and, in fact, reflected a number ($40,939.20) that was not at all accurate for the Excel cargo. This misstatement was material as a matter of law to the claim. However, that does not alone satisfy the Insurers' burden. They must also show that the misstatement was willful and made with the intent to deceive the Insurers. Because the correct settlement amounts were included in the counterclaim of this action, they have failed to establish a dispute of material fact as to this allegation.

---

**9.** It has previously been held that New York law governs this action in the Order of May 15, 2001.

**10.** The Insurers claim that Mirasco had originally sought $932,000 from Excel. Mirasco states that the parties arrived upon the settlement figure based upon the survey documenting that only a small percentage of the total cargo was mislabeled.

**11.** Mirasco had originally informed Monfort that the total loss due to rejected Monfort product was $451,550.

The Insurers first rely on the *ipse dixit* argument that "it is difficult to imagine a more blatant case of insurance fraud" than the facts as stated above. Given the existence of the correct figures in the counterclaim, a jury could not conclude that the facts above reveal a willful intent to defraud. Next, the Insurers quote at great length from the November 30, 2001 deposition testimony of Saher Rizk, stating that Mirasco was attempting to conceal the full extent of the counterclaims as late as that deposition, and that the Insurers were "forced to subpoena suppliers ... in order to determine the truth." This claim is also belied by the fact that Mirasco had already asserted in its counterclaim the extent of the settlements as discussed above. Further, Mirasco stated that it did not notify the Insurers of the settlements prior to that time because they had already denied the claim in whole. Given these facts, the Insurers have not met their burden to show that, based on the undisputed facts, the misstatements on the formal claim were willful and with the intent to defraud the Insurers. In fact, the undisputed facts reveal that such intent could not proven.

In any case, as Mirasco points out, the cases relied upon by the Insurers differ from that presently at bar in that they contained undisputed, egregious actions that are not present here. In *Clerical Apparel of New York v. Valley Forge Ins. Co.*, 209 F.R.D. 316 (E.D.N.Y.2002), the court dismissed the insured's claim after concluding that the insured did not file any meaningful opposition to defendant insurer's motion for summary judgment and effectively admitted material statements proffered in the insurer's Rule 56.1 statement. *Id.* at 320. Further, the insured waited nearly seven months, and less than two days before argument on the motion, to respond to insurer's request for admissions regarding insured's claim of loss. *Id.* at 319. Neither of these situations is pres-

ent here. Further, in *Fine*, 725 F.2d 179 (2d Cir.1984) (precluding insured from recovering for violating the false swearing clause), the insured's owner and managing agent were found by the court to have lied under oath, with such testimony standing uncorrected throughout the proceedings. *Id.* at 182. There is no claim that Mirasco lied under oath.

Because the undisputed facts reveal that the Insurers cannot show that Mirasco had an intent to defraud them in misstating the amount of settlement in its formal claim, summary judgment may not be granted on this ground, and the claim is denied.

### III. There Is No Dispute of Material Fact That the Egyptian Authorities Rejected the Cargo

■ The Insurers next argue that the cargo was not rejected by the Egyptian authorities pursuant to the terms of the Policy. This question requires an analysis of the term "rejection" as used in the Policy.

■ In interpreting contract terms, courts are to "examine the 'reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract.'" *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 757, 628 N.Y.S.2d 253, 254, 651 N.E.2d 1272 (1995) (*quoting Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86 (1918)). Although terms must be construed as they would be by the average person, "[w]hen interpreting a 'specialized business policy,' ... 'the average person is not the housewife purchasing flight insurance but the average purchaser of broad business liability insurance....'" *SR Int'l Bus. Ins. Co. v. World Trade Center Props., LLC*, 222 F.Supp.2d 385, 399 (S.D.N.Y.2002) ("Complex comprehensive general liability policies issued to large corporate manufac-

turers ... should be viewed as if by a reasonably intelligent business person who is familiar with the industry in question. Normally the court can put itself in this position so that expert evidence need not be submitted.") (citations omitted).

■ If there is ambiguity,[12] the *Vargas* standard applies:

[A]n ambiguous provision in an insurance policy is construed "most favorably to the insured and most strictly against the insurer." ... The insurer bears a heavy burden of proof, for it must " 'establish that the words and expressions used (in the insurance policy) not only are susceptible of the construction sought by (the insurer) but that it is the only construction which may fairly be placed on them.' " ... The insurer is "obliged to show (1) that it would be unreasonable for the average man reading the policy to (construe it as the insured does) and (2) that its own construction was the only one that fairly could be placed on the policy."

*Vargas v. Ins. Co. of N. Am.,* 651 F.2d 838, 839–40 (2d Cir.1981) (citations omitted).

The Rejection provision provides that "[s]ubject always to the following conditions and exclusions, this policy is extended to cover the risks of rejection or condemnation by the government of the country of import or their agencies or departments during the period of this insurance."

As an initial matter, the Insurers do not appear to contest that the 60.5 percent of the shipment that was IBP brand was rejected and/or condemned as those words are defined under the policy because of Decree # 6 and based on the fact that the inspectors never even sampled the IBP products. Indeed, the Insurers provided return freight as provided for by Clause D of the Rejection Coverage even though Mirasco did not present any Notices of Rejection or any other formal papers attesting to the fact that the cargo was rejected due to Decree # 6.

■ This fact therefore contradicts the Insurers' contentions that "rejection" under the Policy is defined by custom and usage by the Egyptian government as requiring a Final Rejection Certificate after sampling and testing and adverse lab results, and an unsuccessful appeal. The Insurers did not require any such documents and appeal before sending return freight on the goods it claimed were embargoed. Indeed, this restrictive definition would mean that coverage would not exist if a governmental authority arbitrarily (1) refused to sample and/or test the cargo; (2) declined to permit and/or decide an appeal; or (3) did not issue "final rejection certificates." As Mirasco points out, such restrictive definition would undermine the purpose of rejection insurance, which is a type of political risks insurance that insures against the arbitrary acts of a government, including arbitrary rejection or detention or miscarriage of administrative determination. *E.g., Berns & Koppstein, Inc. v. Orion Ins. Co.,* 170 F.Supp. 707, 720 (S.D.N.Y.1959) ("The peril insured against

---

**12.** According to the Second Circuit:

[A]mbiguity does not exist "simply because the parties urge different interpretations." ... Rather, "the question of whether an insurance policy is ambiguous is a matter of law to be determined by the court." ... In this respect, we have held that "an 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."

*Hugo Boss Fashions, Inc. v. Federal Insurance Co.,* 252 F.3d 608, 616–18 (2d Cir.2001).

by the rejection insurance was not the presence of a putrid substance but the act of the Government. Arbitrary rejection or detention, miscarriage of administrative determination in rejecting or detaining was just as fully covered as justified rejection and detention. . . .").

In any case, it is held as a matter of law that the term "rejection" is not ambiguous and therefore can be construed by its meaning to the ordinary business person. Webster's New Universal Unabridged Dictionary defines rejection as, *inter alia*, the "refusal to accept or grant." The Policy does not define rejection, nor does it require a particular document to have been issued or formal process to have been conducted and completed before rejection may occur. Therefore, Mirasco need only show that the Egyptian authorities refused to accept the cargo for import, or to grant its entry into Egypt.

There is no genuine dispute as to facts showing that the cargo was rejected. Most importantly, Mirasco was given a certificate of re-exportation, which states, according to a translation provided by Mirasco, that "the shipment . . . needs to be re-exported . . . due to rejection by incoming." This document is supported by other customs documents stating that the cargo was rejected. This finding is also supported by the Survey Report commissioned by the Insurers, the testimony of El Shafy regarding his being told that the cargo was rejected, and the fact that the Insurers charged Mirasco an additional "rejection premium" for the claim.

The Insurers' unsupported allegations that the customs documents and El Shafy's testimony cannot be trusted or should not be construed to support a finding of rejection are insufficient to raise a material issue of fact. Similarly, the fact that Mirasco was originally given the opportunity to discharge 10 percent of the cargo per day to segregate the mislabeled cargo does not mean the cargo was not rejected, as discharge does not mean that the goods were accepted for import.

As a result, there is no genuine dispute of material fact that the M/V Spero cargo was rejected by the Egyptian authorities as that term is defined in the Policy.

## IV. *Summary Judgment May Be Granted to the Insurers in Part Based on the Exclusions*

The Insurers contend that even if the cargo was rejected as that term is defined in the Policy, Mirasco is not entitled to coverage because of exclusions to the Rejection Coverage, including an exclusion (1) for loss of market as to all goods, (2) for recovery for anything but return freight due to an embargo announced after a shipment has set said, as against the IBP cargo, and (3) of mislabeling as against the Excel and Monfort cargoes. Each will be addressed in turn.

### A. *The Loss of Market Exclusion Does Not Apply*

■ The Insurers point out that Mirasco was able to sell its cargo once it returned to the United States, albeit for drastically lower prices than they would have received in Egypt due to the collapse of the market for beef livers. As a result, they claim that the Policy's loss of market exclusion applies. Mirasco replies that what occurred in this case was loss of market value, rather than loss of market.

Both parties rely on the same case arising in the Tenth Circuit Court of Appeals, *Boyd Motors, Inc. v. Employers Ins. of Wausau,* 880 F.2d 270 (10th Cir.1989). *Boyd* involved an action to recover under a commercial inland marine policy, which included a "loss of market" exclusion, due to diminished value of automobiles damaged

by hail. *Id.* at 271. The plaintiff had already received reimbursement for the cost of repairing the automobiles, and sought in this action an additional $40,609.48 based on its claim that the vehicles were worth less after the damage. *Id.* The district court had held that "the diminution [in] value which occurs after an accident, despite repairs, clearly is defined as loss in market." *Id.* at 273. The Tenth Circuit disagreed, stating that the above situation involved loss of market value, rather than loss of market, and that recovery was not precluded by the exclusion. In reaching this conclusion, the court discussed the two concepts of loss of market and loss of market value:

'[M]arket' refers collectively to matters external to any particular product item, namely those conditions that determine the degree to which supply of that commodity exceeds or falls short of demand, whereas 'market value' is a function of the qualities (*e.g.*, age, state of repair) inherent in the individual item itself, and refers to that price that that specific article with those qualities would command in a given market. Thus, ... a market is lost when, for example, due to delay in distribution, changes in consumer habits, etc., a certain type of product is no longer in demand with its intended purchasers, while what is involved in the present case, in which particular merchandise in Boyd's inventory has allegedly suffered depreciation due to physical alteration (damage and restoration), is a loss of market value.

*Id.* at 273.

*Boyd* referred to a number of cases discussing "loss of market," including one arising from this Circuit (albeit more than seventy-five years ago), *Dietrich v. United States Shipping Board Emergency Fleet Corp.*, 9 F.2d 733, 744–45 (2d Cir.1925). In *Dietrich*, plaintiff shipper brought an action to recover damages against defendant common carrier for damages sustained by plaintiff due to a depreciation in value and a loss of market value of a shipment of flour on board the steamship Panola, after a delay in the delivery of the flour to its intended port. While the case does not involve an exclusion such as is at issue here, the discussion of loss of market is pertinent toward establishing what the term "loss of market" should mean. The Court discussed a number of cases by way of example:

In [*Aktieselskabet Stavangeren v. Hubbard–Zemurray S.S. Co.*, 250 F. 67, 162 C.C.A. 239 (5th Cir.1918)], a cargo of bananas and coconuts had been shipped from Omoa, Honduras to New Orleans. The shipment did not reach its destination at the time intended. The result was that the shipper lost over $4,000, which represented the difference between what the bananas and coconuts were sold for in the New Orleans market, and what he would have received if the advance orders, which had been given, had not been canceled because of the delay of arrival. The court disallowed the damages occasioned by the loss of the market. ...

One of the leading cases holding that a shipper cannot recover damages for the loss of a market is that of *The Parana*, 2 P.D. 118. The case was decided in 1877 in the English Court of Appeal. The ship, which started from Manila and was to proceed to London, was on the way from 65 to 70 days longer than the fair average time for such a voyage. She carried, among other things, a cargo of hemp. There had been a fall in the price of hemp between the time when the ship ought to have arrived and the time when she did arrive, and the hemp was finally sold at a considerable loss. The court, unanimously reversing the judgment of the Admiralty Division,

held that the consignee was not entitled to recover damages arising from the loss of the market. Mellish, L. J., writing for the court, said:

> The question we have to decide is whether, if there is undue delay in the carriage of goods on a long voyage by sea, it follows as a matter of course that, if between the time when the goods ought to have arrived and the time when they did arrive, there has been a fall in the price of such goods, damages can be recovered by the consignee of the goods.
>
> \* \* \* \* \* \*
>
> There is no case, I believe, in which it has ever been held that damages can be recovered for delay in the carriage of goods on a long voyage by sea, where there has been what may be called a merely accidental fall in price between the time when the goods ought to have arrived and the time when they did arrive—no case that I can discover where such damages have been recovered; and the question is, whether we ought to hold that they ought to be recovered. If goods are sent by a carrier, to be sold at a particular market; if, for instance, beasts are sent by railway to be sold at Smithfield, or fish is sent to be sold at Billingsgate, and, by reason of delay on the part of the carrier, they have not arrived in time for the market, no doubt damages for the loss of market may be recovered. So, if goods are sent for the purpose of being sold in a particular season when they are sold at a higher price than they are at other times, and if, by reason of breach of contract, they do not arrive in time, damages for loss of market may be recovered; or if it is

known to both parties that the goods will sell at a better price if they arrive at one time than if they arrive at a later time, that may be a ground for giving damages for their arriving too late and selling for a lower sum.

The discussion of "loss of market" above suggests that the loss must occur in the original market for which the goods are intended. *See also Nationwide Brokers, Inc. v. C & G Trucking Corp.*, No. 87–C–5770, 1988 WL 116827 (N.D.Ill. Oct. 21, 1988) (rejecting argument that loss of market exclusion precludes recovery where products—outdated magazines—have no market because the exclusion appeared to "assume actual delivery of goods").

There is no evidence that Mirasco lost its customers in Egypt who had already agreed to purchase a good portion of the beef livers on the M/V Spero. As a result, and in the absence of any legal showing to the contrary from the Insurers, the loss of market exclusion does not apply and the Insurers' motion for summary judgment on this ground is denied.[13]

### B. *The IBP Cargo Was Rejected as a Result of an "Embargo," and Thus Mirasco Is Entitled Only to Return Freight*

 The Policy explicitly provides that no claim may attach under Rejection Coverage "[i]n the event of any embargo or prohibition being declared or in being by importing country," except that return freight is provided where the embargo is announced or enforced after shipments have sailed. Rejection Coverage, Clause D. Decree # 6 was announced after the beef liver shipment had sailed. Therefore, if Decree # 6 is an "embargo or prohibition" under the Policy, the Insurers are

---

13. Because of this conclusion, there is no need to address Mirasco's argument that the Insurers are estopped from pursuing this claim.

only responsible for paying the return freight of $400,000, which they have already paid.

■ Because Clause D is an exclusion, it must be given a narrow and strict construction. *Westview Assocs. v. Guaranty Nat'l Ins. Co.*, 95 N.Y.2d 334, 339, 717 N.Y.S.2d 75, 77, 740 N.E.2d 220 (2000). The Insurers have the burden of proving that the exclusion applies to the facts of this case by showing that it (1) is stated in unmistakable and clear language, (2) is not subject to another reasonable interpretation, and (3) applies to the particular circumstances. *Cougar Sport, Inc. v. Hartford Ins. Co. of Midwest*, 190 Misc.2d 91, 94, 737 N.Y.S.2d 770, 773 (N.Y.Sup.2000) (*citing Continental Cas. Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993)).

As discussed above, in interpreting contract terms, courts are to "examine the 'reasonable expectations of the ordinary business[person] when making an ordinary business contract." *Michaels*, 85 N.Y.2d at 757, 628 N.Y.S.2d 253, 651 N.E.2d 1272 (*quoting Bird*, 224 N.Y. at 51, 120 N.E. 86). Also as discussed above, if there is ambiguity, the *Vargas* standard applies, and the ambiguous provision is construed most favorably to the insured and most strictly against the insurer. *Vargas*, 651 F.2d at 839–40.

There is nothing in Clause D to suggest that the term "embargo" is ambiguous. Therefore, the Court will look to the ordinary meaning of the term. According to the United States Supreme Court,[14] "the ordinary meaning of 'embargo' ... is a governmentally imposed quantitative restriction—of zero—on the importation of merchandise." *K mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 185, 108 S.Ct. 950, 957, 99 L.Ed.2d 151 (1988); *see also id.* at 184, 108 S.Ct. at 957 ("An embargo is a 'government order prohibiting commercial trade with individuals or businesses of other nations.'") (*quoting Black's Law Dictionary* 468 (5th ed.1979)).

*K mart* provided examples of other embargoes imposed by the United States, and referred not only to the embargo on Cuba, 22 U.S.C. § 2370(a), but also to a number of "embargoes" imposed against general types of products. *Id.* at 184, 108 S.Ct. at 957 (*citing* 21 U.S.C. § 381 (embargo against adulterated, misbranded or unapproved foods, drugs and cosmetics); 15 U.S.C. § 1397 (embargo against motor vehicles that do not conform to federal safety standards); 19 U.S.C. § 1305 (embargo against obscene pictures, lottery tickets and articles for causing unlawful abortion); 15 U.S.C. §§ 1241–44 (embargo on switchblade knives); and 19 C.F.R. § 12.60

14. "Unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law." *Dolman v. U.S. Trust Co. of New York*, 2 N.Y.2d 110, 116, 157 N.Y.S.2d 537, 541–42, 138 N.E.2d 784 (1956) (looking to contemporary law to define term in contract); *see also Hugo Boss*, 252 F.3d at 618 ("[W]here contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls.... [I]f the pertinent case law is ultimately read as defining the term with sufficient clarity, then the parties' use of that term in an agreement will not be deemed to create an ambiguity.").

Because United States law, and more particularly New York law, governs this action, Mirasco's arguments regarding whether Decree # 6 is an embargo under Egyptian law are irrelevant. In any case, the Insurers have submitted a dueling affidavit arguing that Decree # 6 is an embargo under Egyptian law.

(1987) (embargo on fur-seal or sea-otter skins)).

It is true that the above examples involve embargoes against specific products or groups of products, rather than against products of a particular manufacturer. The definition of "embargo" should nonetheless cover this situation, as Egypt has imposed in Decree # 6 "a quantitative restriction of zero" on the importation of IBP products.

In any case, even if the word "embargo" does not stretch so far, there is no doubt that the restriction against the importation of all IBP goods constitutes a "prohibition" under Clause D. "Prohibition" is defined by Black's Law Dictionary to be "a law or order that forbids a certain action." *Black's Law Dictionary* 1228 (7th ed.1999). The dictionary definition is similar: "a declaration or injunction forbidding some action." *Webster's New International Dictionary, Unabridged* 1978 (2d ed.1944). The common understanding of the word "prohibition" has similar connotations, with one exception. As Mirasco points out, any governmental action—including the rejection on which insurance coverage is based—could potentially be deemed a prohibition under the definitions above as a declaration forbidding the entry of goods. Therefore, a prohibition must be qualitatively different from a rejection. That difference is that the prohibition occurs prior to the government's dealing with the specific cargo at issue and is of a more sweeping nature than the simple administrative function performed by customs officials determining whether or not goods should be permitted into the country. Decree # 6 is such a prohibition, in that it was a law or declaration—issued prior to, separate from and broader than the Egyptian authorities' administrative determination of whether the M/V Spero cargo should be permitted entry—that forbids the importation of IBP products.

Given the common understanding of the words "embargo" as defined in Supreme Court precedent and "prohibition," and the applicability of those definitions in this situation, Mirasco's other arguments are unavailing.

Mirasco also argues in the alternative, however, that even if Decree # 6 is an embargo, Clause D does not apply because the IBP products were not rejected as a result of the Decree, but due to political pressure. The difficulty with this argument is that Mirasco has not presented any evidence that the IBP products were rejected; in fact, they appear to have been completely ignored. The notes taken by the inspectors and the Rejection Notices only explicitly refer to the Excel and Monfort products. Indeed, there is no evidence that the inspectors even sampled the IBP products. Therefore, if the IBP products were not rejected as a result of the embargo—a factual finding that the Insurers appear to concede—it is unclear that they were in fact rejected at all. If the IBP cargo was not rejected, it is not covered by the Policy and no recovery may be had. Therefore, Mirasco's argument merely escapes one difficulty for another. In any case, Mirasco has failed to present a material issue of fact in this regard given the copious documents from Mirasco and its agents ascribing the M/V Spero's problems to Decree # 6 and the lack of any documentary evidence or testimony to the contrary.

As a result, the ban on all IBP products in Decree # 6 constitutes an embargo or prohibition pursuant to Clause D, and the embargo or prohibition was the cause of the rejection of the goods. As a result, Mirasco is only entitled to the return freight for the IBP products, which constitute 60.5 percent of the claim. Because

the Insurers have already provided such return freight, they are entitled to judgment on their claims with regard to the IBP products, and Mirasco's cross-motion for summary judgment is denied inasmuch as it relates to the IBP products.

## C. *The Excel and Monfort Cargo*

■ As an initial matter, there is no dispute that some percentage of the Excel and Monfort Cargo was rejected solely for mislabeling and thus falls under the exclusion in Clause C, Part 5. What is disputed, however, is exactly how much of the cargo falls under this exclusion. Mirasco contends that the correct percentage is represented by the settlements it reached with Excel and Monfort. The Insurers, relying on Mirasco's initial claims for complete remuneration from Excel and Monfort, assert that all of the Excel and Monfort cargo was mislabeled. Given this dispute, it can only be concluded at this time that at least as much of the cargo was mislabeled as was represented in the Excel and Monfort settlements—and potentially more.

What remains is the portion of the cargo that was purportedly rejected for either health and sanitary discrepancies alone or for mislabeling and health and sanitary violations. In seeking summary judgment against these claims, the Insurers assert that Mirasco chose to ship back the cargo after discovering it was rejected on the ground of noncovered events—Decree # 6 and mislabeling—and therefore that any rejection on the basis of health was not the proximate cause of Mirasco's losses.

■ "If a loss is proximately caused by an event covered by the policy, the insurer is liable. If the loss is caused by an event excluded from coverage, the insurer is not liable." *Commodities Reserve Co. v. St. Paul Fire and Marine Ins. Co.*, 879 F.2d 640, 642 (9th Cir.1989). When, however, a loss occurs through a concurrence of two independent events, one covered and one excluded, the loss will be covered. *E.g., Great Northern Ins. Co. v. Dayco Corp.*, 637 F.Supp. 765, 779–80 (S.D.N.Y.1986) ("Where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause.") (*quoting Essex House v. St. Paul Fire and Marine Ins. Co.*, 404 F.Supp. 978, 985 (S.D.Ohio 1975)).

There is no dispute that part of the cause of the return of the cargo was because of uncovered events. These include the embargo or prohibition against IBP products, the mislabeling of the goods and, practically speaking, the stowage of the cargo that made it difficult to extract the potentially viable cargoes of Excel and Monfort beef livers from beneath the banned IBP products.

Mirasco claims that, in addition to the uncovered events, the cargo was also returned as a result of a covered event: the Egyptian authorities' rejection based on an arbitrary refusal to permit the import of beef liver or, alternatively, health and sanitary discrepancies in the beef liver. In light of the holding above that undisputed facts show that the cargo was rejected by the Egyptian authorities, the small percentage of mislabeled goods, and the Survey Report indicating that the "basic trend of the [Egyptian authorities] to reject the liver consignment in any way" through their "obstinacy and abuse of power" (Survey Report, at 4), it is held that the Insurers have failed to raise a dispute of material fact as to whether some portion of the cargo was rejected for covered events and that such rejection was a partial cause of the return of the M/V Spero. What portion of the cargo was rejected for covered

events, however, is a question of fact that remains to be determined.

It is true, as the Insurers point out, that the M/V Spero cargo was, for the most part, sold as wholesome and sound upon its return to the United States. Such sale in fact supports Mirasco's argument that the rejection was arbitrary and is therefore insufficient to show that the cargo was not rejected on health and sanitary grounds; just because the Egyptian authorities claimed that the cargo was unhealthful does not mean that it actually was. This is particularly salient given the Survey Report regarding the Egyptian authorities' tendency to reject all liver shipments in any way possible.

The same logic holds true for the fact that Mirasco did not seek the full amount of loss from Excel and Monfort, but rather only a portion representing the mislabeling claims. Mirasco claims that it did not seek the full amount of loss because it believed that the Egyptian authorities were wrong in claiming health and sanitary deficiencies, and thus based the settlement figures on the surveys completed after the M/V Spero arrived in Houston, which showed that the breadth of mislabeling was small, approximately 8.77 percent of the Excel cargo and a small percentage of the Monfort cargo. This too supports the finding that Mirasco's losses were caused by the arbitrary denial of the goods by the Egyptian authorities.

The Insurers have failed to establish that there is a dispute of material fact with regard to whether Mirasco's losses were proximately caused, at least in part, by events covered by the Policy. As a result, the Insurers' motion for summary judgment is denied. Mirasco's motion for summary judgment is denied because an issue of fact remains as to what portion of the Excel and Monfort cargo, if any, was rejected on grounds covered by the Policy.

## V. *Sue and Labor Clause*

For the first time in their reply papers, the Insurers have raised the defense that Mirasco failed to comply with Clause 34 of the Policy, the "sue and labor" clause, which states:

> In case of any imminent of actual loss or misfortune, it shall be lawful and necessary to and for The Insured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense; safeguard and recovery of the said goods and merchandise, or any part thereof, without prejudice to this insurance; to the charges whereof These Insurers will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of The Insured or of These Insurers in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment.

"When a policy contains a sue and labor clause, an insurer may be able to argue that the insured has forfeited its coverage if it does not sue and labor to minimize the covered loss." *International Commodities Export Corp. v. American Home Assurance Co.*, 701 F.Supp. 448, 452 (S.D.N.Y.1988) (*citing Integrated Container Service, Inc. v. British Traders Ins. Co.*, 1 Lloyd's Rep. 154 (C.A. [Eng.] 1984) (assured who fails to perform its duty under the sue and labor clause may properly be denied coverage on an ensuing claim)).

While there is at least one case that suggests that a "sue and labor" clause should not apply in the context of rejection coverage, *Berns & Koppstein*, 170 F.Supp. at 720, it appears that the parties have contractually agreed that it should apply. Section 7 of Clause C of the Rejection Coverage particularly states that the Policy does not cover claims arising from "[n]on-compliance or breach of any of the provisions or warranties set out in the

terms and conditions of this policy." As a result, if Mirasco's losses occurred as a result of breach of the sue and labor clause, recovery is not available.

The Insurers claim that Mirasco should have unloaded the cargo at the permitted 10 percent-per-day rate and segregated the mislabeled Excel and Monfort goods from the correctly labeled goods. Thus, they argue, the correctly labeled goods could have been sold. There is no factual basis for the claim, however, that the goods could have been sold if they were, in fact, discharged and segregated.

Indeed, Mirasco contends that it did not begin unloading because it was awaiting the lab results from the inspectors and because of the general attitude of the Egyptian authorities, leading Mirasco to believe that even if it did segregate the correctly labeled cargo, the Egyptian authorities would find another reason to reject it.[15] In addition, Mirasco contends (and the Insurers dispute) that the Insurers, through Sea Horse, ordered Mirasco to ship the cargo back to the United States and thus was obligated to follow that directive.[16]

Because the Insurers have not established a genuine dispute with regard to whether Mirasco could have even imported the correctly labeled Excel and Monfort products even if they had discharged and segregated them at a rate of 10 percent per day, their motion for summary judgment is denied.

### Conclusion

In light of the foregoing, the Insurers' summary judgment motion is granted in part and denied in part, and Mirasco's cross-motion is granted in part and denied in part. It is concluded that the Insurers have satisfied the coverage requirements for 60.5% of the cargo, the IBP products, as the are only required under Clause D of the Policy to pay return freight and they have already done so. With regard to the Excel and Monfort cargoes, the only issue left to be decided is what percentage of that cargo, if any, was rejected for a covered reason.

To the extent the above opinion alters the parties' motions *in limine* that are scheduled to be argued on March 19, 2003, the parties should submit revised papers reflecting those changes prior to oral argument.

It is so ordered.

**15.** Indeed, the Rejection Notices are evidence, although disputed, that support this contention. Assuming the Notices to be legitimate, even if Mirasco had discharged the cargo as allowed to segregate the correctly labeled goods, such action would have been for naught as the cargo was rejected for health and sanitary reasons.

**16.** This last argument is less persuasive, however, as it does not explain why Mirasco failed to discharge the cargo for the approximate month's time between being informed of the labeling difficulties and purportedly being permitted to re-export from Egypt.